**PENNSYLVANIA INDUSTRIAL
ENERGY COALITION,
Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.
(Two Cases.)**

Commonwealth Court of Pennsylvania.

Argued Sept. 20, 1994.

Decided Jan. 9, 1995.

Reargument Denied March 6, 1995.

David M. Kleppinger, for petitioner.

Kevin J. Moody, Asst. Counsel, for respondent.

Before SMITH and PELLEGRINI, JJ., and DELLA PORTA, Senior Judge.

PELLEGRINI, Judge.

The Pennsylvania Industrial Energy Coalition (Industrial Coalition) petitions for review two orders of the Pennsylvania Public Utility Commission (PUC) requiring the implementation of demand side management programs by major electric utilities to reduce energy usage and providing a method for those utilities to recover from ratepayers the costs of implementing the programs as well as any revenue lost due to reduced electrical usage. The Industrial Coalition is a group of customers of electricity; they assert that their members consume in excess of 25% of the industrial electricity consumed in Pennsylvania and employ in excess of 100,000 employees at nearly 200 facilities throughout the state. The Office of Consumer Advocate (OCA), the Sierra Club, the Delaware Valley Citizens' Council for Clean Air, and the major electric utilities[1] participate as intervenors.

In 1986, the General Assembly adopted Section 524 of the Public Utility Code (Code), 66 Pa.C.S. § 524, requiring each public utility to submit to the PUC every year information concerning future plans to meet customer demand. The information submitted must address, in relevant part:

> (3) A year-by-year examination of the potential for promoting and ensuring the full utilization of all practical and economical energy conservation for the next 20 years and a discussion of how existing and planned utility programs do or do not adequately reach this potential. Such programs should include, but not be limited

to, educational, audit, loan, rebate, third-party financing and load management efforts to shift load from peak to off-peak periods.

> (4) An explanation of how the utility has integrated all demand-side and supply-side options to derive a resource mix to meet customer demand.[2]

Section 524(a) of the Code, 66 Pa.C.S. § 524(a). To implement the Code, the PUC established regulations to require utilities to implement a "least-cost planning strategy" by planning long-term, cost efficient methods to supply electricity and to lessen the demand needed. *See* 52 Pa.Code §§ 57.49—57.50.

One strategy to provide electricity at the lowest cost would be to establish demand-side management (DSM) programs. DSM is a term of art to describe plans to decrease the demand for energy and promote conservation at a cost less than that of increasing supply. DSM programs are intended to alter the customer's use of electricity by persuading them to use less energy and to consume less energy for the same hours of operation when the hours cannot be reduced. For example, these programs may encourage the customers to utilize less electricity by purchasing more efficient light bulbs, motors and air conditioners or by installing items that lessen energy requirements for heating, such as insulation or multi-pane glass.[3] Utility DSM programs may provide the benefits of postponing the need for additional electric generating facilities and optimizing the use of existing facilities, reducing consumption of non-renewable fuel, increasing cost competitiveness and improving environmental conditions.

---

1. The utilities participating are Duquesne Light Company, Metropolitan Edison Company, PECO Energy Company, Pennsylvania Electric Company, Pennsylvania Power Company, Pennsylvania Power & Light Company and West Penn Power Company.

2. This section of the Code is expanded in the PUC regulations. *See* 52 Pa.Code § 57.49(12)–(15).

3. As stated by the PUC in its December 13, 1993 order, demand side management is one of four resources available to electric utilities; the others being utility-built generators, purchases from other utilities, and purchases from non-utility generators, which are all "supply-side" resources. Load management programs, which are generally included in demand-side resources, are designed to shift customers' demand to off-peak hours although not necessarily reducing the total consumption of electricity.

On October 2, 1990, the PUC formally ordered the major electric utilities to investigate demand-side management options and submit proposals for DSM programs; this order was based on a report by the PUC's Bureau of Conservation, Economics and Energy Planning summarizing the barriers to the development of DSM programs, such as the utilities' uncertainty about how to recover the costs of the program. The PUC ordered the utilities to recommend a universal cost recovery mechanism by which they could all recover the costs of implementing DSM programs.[4]

On October 7, 1991, the PUC ordered that hearings be held by an administrative law judge (ALJ) to develop an appropriate cost recovery mechanism for DSM costs. In that order, the PUC discussed a ratio that had been proposed by the Bureau of Conservation, Economics and Energy Planning as the cost recovery mechanism for DSM costs that was an automatic adjustment surcharge and included a portion of lost revenues. The issues in the extensive hearings before the ALJ centered around the method by which utilities were going to receive reimbursement for the costs of DSM programs, what costs or factors should be reimbursed, and specifically, whether the utilities should be reimbursed for lost revenue.

As to the methods to be used to recover DSM program costs, the two major methods presented for reimbursement were a balancing account and a surcharge. A balancing account would allow utilities to keep a separate accounting of expenses for DSM programs until the next base rate case and to then request reimbursement of the expenses logged in that account from the new rates. A surcharge is a charge directly added to a customer's bill and is outside of the normal ratemaking procedure and is not subject to offset. It is done under an "automatic adjustment clause" which is a provision in a utility's tariff that permits the utility to bill consumers for increases or decreases in specific costs without having to submit to a general rate filing. The clause flows through only expenses and changes to those expenses without including any profit or other recovery; this is known as "dollar for dollar" recovery. At the end of a 12 month period, any over collection or under collection is corrected by either a refund, plus interest, to customers or a charge to customers.

Before the ALJ, the utilities asserted that due to barriers to investment in traditional ratemaking methodology, a costs recovery mechanism outside of rates must be used; they supported a surcharge on all customers that would include lost revenues. The OCA recommended deferring recovery until subsequent base rates, such as through a balancing account, but did not support a surcharge. The OCA disapproved of a surcharge because it would have a negative impact on customers, the approval process would not permit input from non-utility parties, DSM costs would be recovered dollar-for-dollar whereas supply-side costs, such as purchases from other utilities or building power plants, would be subject to offset through a balancing account or general rate cases. The Pennsylvania Energy Office asserted that utilities should use a combination of deferred recovery and a surcharge and would allow lost revenue. The Industrial Coalition opposed any special cost recovery mechanism for DSM so that ratepayers could be assured that only prudent and reasonable costs would be allowed.

The evidence presented was that the benefits of effective DSM programs are that customers can save energy and utilities can cut costs by eliminating or putting off the construction of high cost power plants. There is also some incentive to encourage DSM programs sooner rather than later because it is considerably cheaper to install conservation

4. The OCA filed a petition for reconsideration and clarification of the October 2, 1990 order requesting, among other things, that the DSM programs be subject to further review when the costs incurred were sought to be recovered. The Industrial Coalition filed a petition to intervene and also requested reconsideration. The PUC denied the petitions for reconsideration or modification.

measures at the time of new construction than after construction is completed. The major difference between a balancing account cost recovery mechanism and a surcharge is that a balancing account defers any recovery until the next base rate case and a surcharge allows current funding of programs, theoretically freeing up capital for more or larger DSM programs.

Also at issue before the ALJ was whether incentives should be granted to utilities and whether recovery of lost revenues as a cost should be allowed the utilities. The original cost recovery ratio proposed by the Bureau of Conservation, Economics and Energy Planning would include performance incentives as well as the amount of annual net revenues, based on the non-fuel portion of existing rates, which are expected to be lost as a result of successful implementation of a utility's DSM program. The purpose of incentives was to overcome the disincentives within the regulatory system to DSM programs, such as the uncertainty that costs will be recouped and the decrease in earnings between rate cases due to costs of programs.

As to lost revenues, a portion of the calculated amount of lost revenues would be recoverable, so that savings would be "shared" with customers and the portion would decrease over time (in five percent increments). Any recovery of lost revenues would end five years from the start of each program or when that program ends, whichever is less. The purpose of allowing lost revenues is to cover non-avoidable costs and further encourage the DSM programs. (R.R. 532a).

Addressing the cost recovery system as well as the awarding of incentives and recoupment of lost revenues, the ALJ made the following recommendations:

- a cost recovery system be adopted allowing dollar-for-dollar recovery of costs for DSM through base rates, with a balancing account to track investments incurred between rate cases;

- a surcharge mechanism is unnecessary;

- annual prudence reviews of on-going and proposed DSM programs should be done;

- recovery of costs should be class-specific, that is, recovered from the class of customers who is intended to benefit from the individual program; and

- lost revenues generally should not be recovered but if allowed should be recovered only to the extent that they target existing load and only when revenues do not exceed the level established in the utility's last base rate case.[5]

Adopting in part and rejecting in part the ALJ's recommended decision, the PUC issued its decision on December 13, 1993, determining that because DSM is unique in that a successful plan would result in decreased demand for electricity and in decreased revenues, a special mechanism for the recovery of costs was appropriate. The PUC determined that the option of either a balancing account or surcharge for recovery of DSM program costs was allowable, as well as recovery of lost revenues and incentives. The PUC specifically held:

- direct and collateral DSM program costs could be recovered through an annual surcharge under Section 1307 of the Code, 66 Pa.C.S. § 1307, for five years as a line item charge on the customer's bill with an annual adjustment;[6]

- those same costs could be recovered, as an alternative mechanism, by utilizing a

5. Exceptions and reply exceptions were filed by several individual electric companies, the OCA, the Industrial Coalition and the environmental groups.

6. The PUC has defined "direct" program costs as including, but not limited to, company labor, program measure hardware, rebates, grants, payments to third parties and direct program marketing; "collateral" program costs have been defined as the cost of all other administrative activities associated with program development and implementation including, but not limited to, program management, general DSM advertising, DSM research and development activities, measurement and evaluation, and obtaining PUC approval of DSM programs. These costs are recoverable when incurred during the computational year, whether they are fixed or variable, minus the actual dollar amounts included in base rates.

balancing account to accumulate costs until the next base rate and then recovering the costs in rates, with interest at the prevailing AFUDC rate (Allowance for Funds Used During Construction rate);

• annual prudence reviews of on-going and proposed DSM programs must be prepared by the utilities and reviewed by the Bureau of Conservation, Economics and Energy Planning, with input from consumers and other groups;

• lost revenue could be recovered, with interest, but could not be recovered utilizing the surcharge mechanism;

• financial incentives could be recovered for each kilowatt hour saved as a result of the program either annually or deferring for recovery in a rate base case within five years (incentives calculated as the number of kilowatt hours saved multiplied by the off-system sale price per kilowatt hour); corresponding penalties would be enforced after four years;

• any recovery must be customer class specific, that is, a company may only allocate costs to those customers for which the DSM program is intended to benefit.[7]

Within a few days of the December 13, 1993 order, both the OCA and the Pennsylvania Energy Office filed petitions for reconsideration and clarification of the PUC's order. They requested that the PUC determine whether lost revenue recovery for new load was permitted and to define the limits on recovering lost revenues, define off-system sales, the basis for the calculation of incentives, explain the relationship of off-system sales to the success of DSM programs, clarify whether the utilities should implement the incentive recovery, determine who may participate in approval process for DSM programs, and clarify the designation of the appendices. Also, the Industrial Coalition filed a petition for review in this court of the December 13, 1993 order.

■■■ On April 8, 1994, the PUC issued an order and opinion stating it was granting "reconsideration and clarification". After setting out the standard for when reconsideration or rehearing is granted in its order, the PUC addressed several issues raised by OCA and Pennsylvania Energy Office. The PUC held that the recovery of lost revenues due to the implementation of DSM programs for new load is permissible. The PUC also stated a detailed method of determining an off-system sales figure to be used for the calculation of the financial incentive provided to utilities for DSM implementation.[8] The Industrial Coalition then filed a petition for review of the April 8, 1994 order and these appeals were consolidated.[9]

I.

■■■ Initially, we must determine what order is before this court · for review: the

---

7. After rejecting the ratio for recovery originally proposed by the Bureau of Conservation, Economics and Energy Planning, the PUC adopted a Demand Side Cost Rate formula:

$$DSCR = \frac{C + I + E}{S} \times \frac{1}{1 - T}$$

In the formula, C is cost of the programs, i.e., the DSM expenditures for a class of customers; I is incentive, the off system sales margin price multiplied by the kilowatt hours saved for that customer class, less the penalty adjustment; E is the adjustment factor or the experienced net over collections or under collections of the program costs as of the end of the year period with interest computed monthly. Additionally, S is the projected total kilowatt hour sales to the same customer class during the year period and T is the Pennsylvania Gross Receipts Tax Rate in effect during the billing month.

8. In the April 8, 1994 order, the PUC also denied a petition for stay or supersedeas pending appeal

filed by Metropolitan Edison and Pennsylvania Electric Company because, among other things, those parties had not filed an appeal of the prior decision.

9. The order before this court is a declaratory order issued under Section 331(f) of the Code, 66 Pa.C.S. § 331(f), to conclude an investigation initiated by the PUC under subsection (a) of the same section. Declaratory orders are adjudications and are final and appealable. *Professional Paramedical Services, Inc. v. Pennsylvania Public Utility Commission,* 106 Pa.Commonwealth Ct. 278, 525 A.2d 1274 (1987), *petition for allowance of appeal denied,* 517 Pa. 627, 538 A.2d 879 (1988). This court's scope of review of an adjudication by the PUC is limited to determining whether there was a violation of constitutional rights, an error of law was committed, or whether the findings of fact were supported by substantial evidence. *Pocono Water Company v. Pennsylvania Public Utility Commission,* 158 Pa.Commonwealth Ct. 41, 630 A.2d 971 (1993).

PUC's December 13, 1993 order or the PUC's April 8, 1994 order addressing the OCA and Pennsylvania Energy Office's petitions for reconsideration. The Industrial Coalition contends, first of all, that the April 8, 1994 order must be vacated because the PUC could not act upon the petitions for reconsideration after it failed to expressly grant those petitions under the Rules of Appellate Procedure, specifically, Pa.R.A.P. 1701. Pa. R.A.P. 1701 requires the PUC to expressly grant a petition for reconsideration within the time prescribed for the filing of a petition to review to this court, that is, 30 days after the entry of the order pursuant to Pa.R.A.P. 1512(a)(1).

Pa.R.A.P. 1701 provides:

(a) Except as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter.

(b) After an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may:

(1) Take such action as may be necessary to preserve the status quo, correct formal errors in papers relating to the matter, cause the record to be transcribed, approved, filed and transmitted, grant leave to appeal in forma pauperis, grant supersedeas, and take other action permitted or required by these rules or otherwise ancillary to the appeal or petition for review proceeding.

* * * * *

(3) Grant reconsideration of the order which is the subject of the appeal or petition, if:

(i) an application for reconsideration of the order is filed in the trial court or other government unit within the time provided or proscribed by law; and

(ii) an order expressly granting reconsideration of such prior order is filed

in the trial court or other government unit within the time prescribed by these rules for the filing of a notice of appeal or petition for review of a quasijudicial order with respect to such order, or within any shorter time provided or prescribed by law for the granting of reconsideration.

The PUC counters that it was granting only "clarification" of the December 13, 1993 order and that it did not make any substantive changes to its prior decision. It contends the clarification was only to preserve the status quo as permitted under Pa.R.A.P. 1701(b)(1). Even though the April 8, 1994 order states it grants a petition for "reconsideration and clarification" and sets forth the standard applicable to the grant of rehearing and reconsideration, the PUC argues, by quoting their petitions, that the OCA and the Pennsylvania Energy Office actually sought only clarification.

■■ How the parties termed their requests and how the PUC termed its order is not controlling. *Abramson v. Pennsylvania Public Utility Commission*, 489 Pa. 267, 414 A.2d 60 (1980). What is controlling is the effect of the order by the PUC. If the PUC reexamines their earlier decision and either substantively modifies it or rescinds it, reconsideration was granted. *Abramson; Scott Paper Company v. Pennsylvania Public Utility Commission*, 126 Pa.Commonwealth Ct. 111, 558 A.2d 914 (1989) (substantive changes are not "clarification" and notice and an opportunity to be heard is required).

■ On the other hand, a "clarification" as allowed in Pa.R.A.P. 1701(b)(1) is to "correct formal errors in papers relating to the matter", that is, non-substantial technical amendments to an order, changes in the form of a decree, and modification of a verdict to add prejudgment interest. *In re Farmland Industries, Inc.*, 109 Pa.Commonwealth Ct. 304, 316 n. 3, 531 A.2d 79, 84 n. 3 (1987), *petition for allowance of appeal denied*, 517 Pa. 631, 539 A.2d 812 (1988). *See* 1 G. Darlington, K. McKeon, D. Schuckers, K. Brown,

Pennsylvania Appellate Practice § 1701:13 (supp.1993). Other actions permitted in the subsection such as those "to preserve the status quo" include only those matters that are auxiliary to the appellate process, such as a supersedeas or injunction which are designed to hold in abeyance the enforcement of the judgement of the lower tribunal. *See Goodstein v. Goodstein*, 422 Pa.Superior Ct. 331, 619 A.2d 703 (1992), *appeal dismissed*, 536 Pa. 449, 639 A.2d 1180 (1994). Such actions have no effect on the appeal or petition for review and cannot prompt a new appealable issue. Any modification of the December 13, 1993 order in the April 8, 1994 order then is in the nature of a reconsideration, not a clarification. *Westinghouse Electric Corp. v. Pennsylvania Public Utility Commission*, 44 Pa.Commonwealth Ct. 407, 404 A.2d 712 (1979).

In its April 8, 1994 order, the PUC addressed a number of issues raised in the petitions for reconsideration and clarification; two are of import as to whether reconsideration rather than clarification was granted:

- defined "off-system sales" in the calculation of incentives and penalties; and,

- recovery of lost revenues for new load.[10]

As to the calculation for incentives and penalties for DSM programs, the calculation stated in the December 13, 1993 order was "the off-system sales price per KWH, multiplied by the number of KWHs saved". (December 13, 1993 order, p. 84). There was no discussion within that opinion defining or explaining how the utilities would derive the "off-system sales price" and because such a calculation was not developed by the parties to the proceedings, they requested reconsideration and clarification, arguing that the calculation should be more fully explored. The PUC responded:

In considering this issue, we have reviewed the incentive mechanism for the purpose of developing a definition of off-system sales that is applicable and consistent for all electric utilities. We have arrived at the following definition. The off-system sales should correspond to non-firm energy sales. Account 447 ("Sales for Resale"), in the companies' FERC Form I annual reports displays all off-system sales. For PJM companies, a line item on Account 447 indicates off-system sales to PJM. PJM should use this rate to calculate their off-system sales incentive.

(April 8, 1994 order, pp. 18–19). The discussion continues giving instructions for non-PJM companies and allows a company to suggest another off-system rate by submitting it to the Bureau of Conservation, Economics and Energy Planning and allowing the Bureau to establish another rate. The PUC addressed an issue not raised in the earlier decision and substantively changed the calculation for incentives and penalties in its April 8, 1994 order by defining the term under different circumstances and allowing utilities a mechanism to establish a different rate that it considers more fair. This action by the PUC was a "reconsideration" of its prior order and not a mere "clarification".

Likewise, the PUC in the April 8, 1994 order addressed the issue of lost revenues for new loads which it admitted it did not address in its earlier order. Although in its December 13, 1993 order, the PUC allowed the recovery of lost revenues in a general base rate case rather than through the surcharge mechanism, it did not discuss whether lost revenue relating solely to new loads was permitted. The prior order, of October 7, 1991, stated that recoupment of lost revenues would be limited to DSM programs targeted at existing loads only. In the April 8, 1994 order, the PUC permitted the recovery of lost revenue for new loads as well as existing loads. The PUC then stated the lost revenue measure for new loads is only on net

10. In the remaining sections of the April 8, 1994 order, the PUC expressly denied requests for reconsideration or clarification as to whether evidentiary hearings must be held on DSM proposals and whether restrictions on recovery of lost revenues set by the ALJ were adopted. The PUC stated that the process for approval of DSM proposals was set in the October 7, 1991 order, which is still in effect, and that the recommendations by the ALJ not specifically adopted are not effective. The PUC's action on these issues may be seen as "clarification" of the prior order.

improvement. The PUC set up new rules for determining when lost revenue can be recoverable and made a substantive change to the determination set forth in the prior order. It also raised a new issue that the Industrial Coalition and OCA are raising on appeal.

■ Because the PUC made substantive changes to its earlier decision, it, in fact, "reconsidered" the December 13, 1993 order rather than merely clarifying it. *Abramson; Scott.* To reconsider its decision, under Pa. R.A.P. 1701(b)(3), the PUC is required to expressly grant reconsideration of the prior order in an order filed within the time prescribed for filing the petition for review. *See Schoff v. Richter*, 386 Pa.Superior Ct. 289, 562 A.2d 912 (1989). Without that timely, express grant of reconsideration, the PUC lacked authority to issue the April 8, 1994 order and we are without jurisdiction to review it; that order is vacated. *See Vanleer v. Lerner*, 384 Pa.Superior Ct. 558, 559 A.2d 577 (1989). Our review then is of the December 13, 1993 order, timely appealed by the Industrial Coalition, and we will not address the propriety of the "off-system sales" calculation or whether recovery of lost revenues for new loads is permitted under the Code.

## II.

In regard to the December 13, 1993 order, the Industrial Coalition contends that allowing special ratemaking treatment through the surcharge and balancing account for the recovery of direct and collateral DSM program costs is beyond the powers of the PUC as granted in Section 1319 of the Code, which only allows "prudent and reasonable costs". It also contends that the recovery mechanism violates Section 1315 of the Code which, it argues, prohibits the recovery of costs that are not used and useful. The Industrial Coalition argues that the costs cannot be prudent and reasonable because no quantifiable evaluation of the programs can be done until after the program is in effect for a period of time and any determination of pru-

dence would be based on forecasted costs. Likewise, a determination of whether a DSM program is used and useful, the Industrial Coalition argues, must be done after the program has been in effect for some time or there is no way to determine if the program is providing an actual utility service to the customers.

The Code addresses cost recovery of DSM program costs in Section 1319, 66 Pa.C.S. § 1319, by stating that if a conservation program is established by a utility that the commission determines to be "prudent and cost-effective":

> [T]he commission shall allow the public utility to recover all prudent and reasonable costs associated with the development, management, financing and operation of the program, provided that such prudent and reasonable costs shall be recovered only in accordance with appropriate accounting principles. Nothing in this section shall permit the recovery of costs in a manner prohibited by section 1315.... Nothing in this section shall permit the recovery of the cost of producing, generating, transmitting, distributing or furnishing electricity or natural gas.

Section 1315 of the Code, referred to in Section 1319, provides:

> Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities ..., the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public. Except as stated in this section, no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.

■ Because Section 1319 allows the recovery of costs for DSM programs deter-

mined to be prudent and cost effective, the PUC has established a method whereby the proposed programs will be proposed for a determination of whether they are prudent and cost-effective. Once a program is determined prudent and cost-effective, the statute specifically allows the recovery of all costs which are prudent and reasonable. The parties have little or no experience in establishing the programs and the determination of costs necessarily must be based on forecasts and projections. The statute does not prohibit the PUC from assuming that certain costs are reasonable to implement an approved program; this would include the direct and collateral costs of a DSM program (*supra* footnote 6). The prediction of costs is the basis of ratemaking and it is not unreasonable for the PUC to rely on well-supported forecasts in this context as well. This is particularly appropriate because both the surcharge and the balancing account method permit adjustment and require approval of costs.

■ As to the Industrial Coalition's argument that the costs are not related to used and useful expenses, Section 1315 expressly applies only to determine when the costs of construction or expansion of facilities may be included in the rate base. *Barash v. Pennsylvania Public Utility Commission,* 507 Pa. 430, 490 A.2d 806 (1985). *See also Barash v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 532 A.2d 325 (1987), *affirmed,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). Section 1315 is only applicable to the extent that DSM programs costs relate to physical facilities and is not relevant to determine whether the cost recovery methods approved by the PUC are violative of the Code. Because new physical facilities are appropriate costs only within the rate base under Section 1315, in the unlikely event that DSM programs require new physical facilities, those costs should be raised in a base rate case only, subject to the restrictions of Section 1315, and not through the surcharge mechanism.

11. Section 1301 of the Code provides:
 Every rate made, demanded or received by any public utility, or by any two or more public

## III.

Aside from the general arguments against special recovery mechanisms, the Industrial Coalition also contends that each method of recovering program costs approved by the PUC, the balancing account recovered in later base rates and the annually adjusted surcharge, violates the Code.

### A.

■ First, as to the balancing account, the Industrial Coalition argues that it violates Section 1301 of the Code which requires that all rates set for a public utility be "just and reasonable".[11] The PUC found that it is reasonable for "electric utilities to be permitted to accumulate prudently-incurred DSM program costs in a balancing account, and to seek recovery of those costs, plus a return at the prevailing AFUDC rate, in base rates through a subsequent general rate proceeding". (December 13, 1993 opinion, p. 37). This mechanism allows no recovery except through the next rate proceeding, subjecting the utility to a determination of whether its rates are just and reasonable at that time, after DSM program costs are included in its rate proposal. Because this mechanism specifically provides a later determination of just and reasonable rates, there is no violation of Section 1301 of the Code in the PUC's allowance of a balancing account recovery mechanism at this stage in the proceedings.

### B.

■ The Industrial Coalition also argues that the balancing account method is retroactive ratemaking. The electric companies argue that the Industrial Coalition failed to preserve the issue of retroactive ratemaking because it was not raised before the PUC or in the petitions for review. Under the Pennsylvania Rules of Appellate Procedure, "[n]o question shall be heard or considered by the court which was not raised before the gov-

utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission....

ernment unit". Pa.R.A.P. 1551(a). *See also* Section 703(a) of the Administrative Agency Law, 2 Pa.C.S. § 703(a); *Pennsylvania Power Company v. Pennsylvania Public Utility Commission,* 127 Pa.Commonwealth Ct. 97, 561 A.2d 43 (1989), *affirmed,* 526 Pa. 453, 587 A.2d 312, *cert. denied,* 502 U.S. 821, 112 S.Ct. 80, 116 L.Ed.2d 53 (1991). After reviewing the record below, we agree with the electric utilities that the Industrial Coalition did not raise the issue before the PUC.

Nonetheless, the Industrial Coalition argues that the petition for review raised the issue of retroactive ratemaking by generally contending that the PUC's decision fails to protect ratepayers from unjust and unreasonable rates. However, the issue must first be raised before the agency so that factual findings can be made and in order to give the agency the opportunity to decide issues delegated to it. The arguments made by the Industrial Coalition to the PUC did not raise retroactive ratemaking.

### C.

■■■■ Turning to the surcharge mechanism, the Industrial Coalition argues that an automatic adjustment of rates under Section 1307 of the Code does not include types of costs like DSM program expenses which would be recovered in the surcharge, and that the section is limited to costs beyond the control of the utility such as fuel costs and certain taxes. Section 1307, 66 Pa.C.S. § 1307, provides, in relevant part:

(a) Any public utility, ... may establish a sliding scale of rates or such other method for the automatic adjustment of the rates [12] of the public utility as shall provide a just and reasonable return on the rate base of such public utility, to be determined upon such equitable or reasonable basis as shall provide such fair return....

(b) The commission, by regulation or order, upon reasonable notice and after hearing may prescribe for any class of public utilities ... a mandatory system for the automatic adjustment of their rates, by means of a sliding scale of rate or other method, ... to become effective when and in the manner prescribed in such regulation or order.

Section 1307 also specifically allows the recovery of fuel costs, including natural gas, through automatic adjustment procedures in subsections (c) and (f). 66 Pa.C.S. § 1307(c) and (f).[13] In subsection (e), the General Assembly provided a year-end adjustment of recovery based on the total of actual expenses for the period as compared to the projected expenses used to determine the charge. After a public hearing on the report of adjustments needed, the PUC is given the authority to order a refund to customers if the charges exceeded the actual expenses. 66 Pa.C.S. § 1307(e).

In *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 81 Pa.Commonwealth Ct. 148, 171–72, 473 A.2d 1109, 1121 (1984), we held that the purpose of this section was to permit reflection in customer charges of changes in one component of a utility's cost of providing public service without the necessity of the broad, costly and time-consuming inquiry required in general rate cases and the automatic provision does not eliminate the requirement for approval of revisions in the charges by the PUC.[14]

To be appropriate for automatic adjustment, the Industrial Coalition argues, the

---

**12.** Rate is defined in Section 102 of the Code, 66 Pa.C.S. § 102, as "every individual, or joint fare, toll, charge, rental or other compensation whatsoever of any public utility ...".

**13.** *See Procter & Gamble Paper Products Company v. Public Utility Commission,* 154 Pa.Commonwealth Ct. 190, 193 n. 1, 623 A.2d 410, 412 n. 1, *petition for allowance of appeal denied,* 535 Pa. 627, 629 A.2d 1386 (1993).

**14.** In *Allegheny Ludlum Steel Corporation v. Pennsylvania Public Utility Commission,* 501 Pa. 71, 459 A.2d 1218 (1983), the Supreme Court held that the automatic adjustment of electric rates pursuant to Section 1307 of the Code to reflect fuel cost increase did not violate due process because, although implemented without opportunity for opponents of an increase to be heard, the PUC must approve increases through a subsequent, year-end proceeding for a final determination and adjustment of rate increases,

costs must be large in magnitude in relation to the utility's rate base, volatile, like fuel costs, specifically identifiable, and beyond the control of the utility, which it argues is unlike DSM program costs. It asserts that the statute is only applicable to fuel costs and certain taxes as it has already been applied by the PUC. It cites *Masthope Rapids Property Owners Council v. Pennsylvania Public Utility Commission,* 135 Pa.Commonwealth Ct. 437, 581 A.2d 994 (1990). In *Masthope,* we held that a water utility could not recover the principal and interest of a loan received under the Water Facilities Restoration Act, 32 Pa.C.S. §§ 7501–7518, through an automatic adjustment of rates because Section 1307 did not provide the necessary review required by the Water Act. We stated:

> [T]he automatic adjustment of public utility rates may only occur in certain limited instances. . . . Section 1307 has been customarily employed, for example, as the statutory predicate for the implementation of electric cost rates by certain electric utilities, . . . and is also employed for recovery of natural gas costs by natural gas utilities. Further, in all such proceedings the Commission's review is appropriately characterized as preliminary and cursory. Indeed, the very function of the typical automatic adjustment clause is to permit rapid recovery of a specific *identifiable* expense item, with a more comprehensive analysis upon reconciliation of actual costs with previously projected costs used to establish the effective rate. The initial process is essentially a mathematical review of the projections provided by the public utility. Therefore, there is no initial review to determine the appropriateness or necessity of the rate request.

*Id.* at 447–48, 581 A.2d at 999–1000 (emphasis in original).

Although we agree that Section 1307 should have limited application and the PUC

should not use it to disassemble the traditional rate-making process, the General Assembly did not limit the allowance of automatic adjustment to only fuel costs and taxes which are generally beyond the control of the utility. Instead, the General Assembly specifically allowed the recovery of fuel costs and also allowed the PUC or the utilities to initiate the automatic adjustment of costs within specific procedures.[15] Unlike in *Masthope,* in this case, Section 1319 of the Code specifically states that all prudent and reasonable costs should be recovered and sets forth requirements that the proposed programs be determined to be "prudent and cost-effective" by the PUC (or the Bureau of Conservation, Economics and Energy Planning as designated by the PUC), before any costs may be recovered through the surcharge mechanism.

▪ Because Section 1319 directs the PUC to allow recovery of all prudent and reasonable costs for developing, managing, financing and operating DSM programs and because Section 1307 gives the PUC the discretion to establish by either regulations or order the manner in which automatic adjustment recovery may be instituted and when such automatic adjustment of rates should be mandated, the surcharge method is permitted. This court is not free to substitute its discretion for the discretion properly exercised by the PUC in establishing the surcharge method. *West Penn Power Company v. Pennsylvania Public Utility Commission,* 147 Pa.Commonwealth Ct. 6, 607 A.2d 1132 (1992).

**D.**

▪ Permitting a surcharge, the Industrial Coalition also argues, is impermissible single-issue ratemaking. It relies on *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa.Commonwealth Ct. 102, 147, 464 A.2d 546, 567

---

allowing full participation by interested parties and requiring refunds if increases were excessive.

**15.** The PUC incidentally argues that there was sufficient evidence that DSM program costs would be volatile, identifiable, and have the potential for being large in magnitude.

(1983), where we stated, in the context of tariff supplements, that the consideration of expense and revenue items in isolation could result in confiscatory rates. Also, in *Philadelphia Electric Company v. Pennsylvania Public Utility Commission*, 93 Pa.Commonwealth Ct. 410, 422, 502 A.2d 722, 727–28 (1985), we held that there should be no line-by-line examination of items in a rate case and an isolated item of revenue or expense may not be, without more, the subject of a refund or recovery. The utilities argue that there is no general prohibition against single-issue ratemaking under the Code.

■■■ Single-issue ratemaking is similar to retroactive ratemaking and, in general, is prohibited if it impacts on a matter that is normally considered in a base rate case. This is, however, not a base rate case. No party has asked for specific recovery of a line item that traditionally would be requested in a rate-making procedure. The PUC applied Section 1307's authorization to specifically allow an automatic adjustment of rates outside of the rate-making procedures. Because the surcharge is permitted under the Code, with procedures to determine the reasonableness of the charges outside of a base rate case, the doctrine of single-issue ratemaking is inapplicable.[16]

### IV.

The Industrial Coalition finally contends that any incentive and lost revenue recovery is improper. The PUC held in its December 13, 1993 decision that "DSM investment should be given a boost by affording the utilities the opportunity to earn rewards, if the utilities can verify, in an annual proceeding, the KWH savings via DSM programs."[17]

16. The Industrial Coalition also relies on the Illinois Appeals Court opinion in *A. Finkl & Sons Company v. Illinois Commerce Commission*, 250 Ill.App.3d 317, 189 Ill.Dec. 824, 620 N.E.2d 1141 (1993), *appeal denied*, 153 Ill.2d 557, 191 Ill.Dec. 616, 624 N.E.2d 804 (1993). In that case, the Illinois court held that permitting a rider to recover DSM costs was single-issue ratemaking. However, in that case, the Illinois statute allows for automatic adjustments of costs only in specific and much narrower circumstances; for exam-

(December 13, 1993 order, p. 84). "Incentives or penalties would be determined in the annual cost recovery proceeding, though utilities would have an option to defer recoupment of incentives, with interest, at the utility's AFUDC rate, or disbursement of penalties to a base rate case to occur within five years." (December 13, 1993 order, p. 85). In Appendix A, the PUC explained that after verified in an annual program evaluation process, the incentives could be collected monthly with program expenses in the surcharge. (December 13, 1993 order, p. A–3).

Additionally, the PUC allowed recovery of lost revenues through base rates. The PUC stated: "lost revenues are, by their nature, much more difficult to measure than DSM program costs. Therefore, we feel it necessary to require that these costs be recovered through a base rate proceeding so that they are based on actual program results, as verified through the ratemaking process . . . . and they will be treated as regulatory assets." (December 13, 1993 order, pp. 72–73). The purpose of permitting the recovery of lost revenues in the first five years of the programs was to further encourage utilities to develop DSM programs because successful DSM activities reduce sales by the utility resulting in the loss of earnings to pay for fixed costs.

### A.

■■■ As to financial incentives, the Industrial Coalition contends that awarding incentives is unnecessary because utilities are required by Section 524 of the Code, 66 Pa.C.S. § 524, to propose and implement demand-side management. It also contends that incentives (or penalties) outside of a general

ple, the recovery of fuel costs and municipal taxes. *See* ILL.REV.STAT. Ch. 220, para. 5/9–220—9–222 (1994).

17. The calculation for the incentives, relating to the off-system sales price of kilowatt hours, was developed in the April 8, 1994 reconsideration order. However, as discussed *supra*, because the PUC did not timely grant reconsideration, we have no jurisdiction to address the calculation.

base rate case are not permitted by the Code which sets forth a specific procedure for awarding utilities for cost-effective conservation programs, citing Section 523 of the Code, 66 Pa.C.S. § 523. To the contrary, the PUC argues that Section 523 fully authorizes the establishment of an incentive component. The PUC also argues that incentives are necessary to encourage DSM activities and lists all the disincentives to DSM programs and the parties' arguments that incentives are needed.

Section 523 provides:

(a) The commission shall consider, in addition to all other relevant evidence of record, the efficiency, effectiveness and adequacy of service of each utility *when determining just and reasonable rates* under this title. On the basis of the commission's consideration of such evidence, it shall give effect to this section by making such adjustments to specific components of the utility's claimed cost of service as it may determine to be proper and appropriate. Any adjustment made under this section shall be made on the basis of specific findings upon evidence of record, which findings shall be set forth explicitly, together with their underlying rationale, in the final order of the commission.

(b) ... the commission shall consider the following:

. . . . .

(4) Action or failure to act to encourage development of cost-effective energy supply alternatives such as conservation or load management, cogeneration or small power production for electric and gas utilities. (emphasis added).

 Section 523 only applies to the adjustments being made when rates are determined and based on a utility's claimed costs of service. The section permits incentive adjustments for effective conservation programs and penalty adjustments for the failure to encourage conservation only within a base rate case.[18] Whether or not incentives are "necessary" to encourage DSM programs is irrelevant, where the agency lacks authority to award those incentives. Because this section permits adjustments within a base rate case, a mechanism permitting incentives through a surcharge is beyond the authority of the PUC. As to the incentive mechanism of deferring recovery until the base rate case, there is nothing to prohibit the determination of a calculation of incentives, but the PUC is bound to follow the requirements of Section 523 at the time of the base rate case in exercising its discretion of whether to make adjustments based on specific findings.

 The Industrial Coalition also argues that the calculation of financial incentives stated in the December 13, 1993 order is not supported by substantial evidence. In *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 163 Pa.Commonwealth Ct. 367, 375, 643 A.2d 130, 134 (1994), the utility requested a higher "interruptible service credit". While the ALJ adopted the proposed methodology for calculating such a credit and resulting $5.89 per kilowatt rate, the PUC rejected the methodology and adopted an increase in the credit to $3.04 per kilowatt rate. We found that although the PUC was not required to adopt the ALJ's recommendation, it was not free to adopt a rate that was not supported by substantial evidence. Because there was nothing in the record to support the rate adopted by the PUC, we held the finding could not stand. *See also Scott Paper Company v. Pennsylvania Public Utility Commission*, 126 Pa.Commonwealth Ct. 111, 558 A.2d 914 (1989). In this case, the calculation of incentives adopted by the PUC was not addressed by the parties on the record of the proceedings

**18.** Although this court has not previously addressed Section 523, the PUC itself has consistently exercised its authority to give incentives and penalties under Section 523 in *rate* cases. *See, e.g., Public Utility Commission v. West Penn*

*Power Company,* (Docket No. R–000922378, filed May 14, 1993); *Public Utility Commission v. Metropolitan Edison Company,* 141 P.U.R. 4th 336 (1993).

before the PUC and there was no evidentiary basis for that calculation.

 The PUC argues, however, that the calculation is a well documented valuation of energy that it has the discretion to adopt. If the PUC had chosen to issue regulations in this matter, we would agree that the PUC had the discretion to issue regulations for comment with such a calculation. But in this case, the PUC chose to use the more adversarial investigation and declaratory order process. In such a case, as stated by the PUC in oral arguments, we are required to review the findings on a substantial evidence basis. Accordingly, no methodology could be adopted that was not developed on the record with substantial evidence to support it. We will reverse that part of the PUC's order allowing recovery of incentives through the surcharge mechanism and adopting the calculation for incentives.

## B.

 The Industrial Coalition also contends that the recovery of lost revenue is improper because it is impossible to accurately calculate both the actual amount of revenue lost due to a DSM program and the consequent impact on the utility. Because lost revenues are impossible to accurately predict, the Industrial Coalition argues, the PUC cannot assure that the resulting rates will be just and reasonable under Section 1301 of the Code. The OCA contends that allowing lost revenue recovery without any relation to increased revenues from other sources, such as additional sales, is arbitrary and will lead to unjust and unreasonable rates. The OCA argues that the PUC's orders leave it "unclear whether the Commission will review such factors as the effect of revenue growth which may occur simulta-

19. In its April 8, 1994 order, the PUC stated that the precise methods and procedures for calculating lost revenues would be resolved during DSM program evaluation process. (April 8, 1994 order, p. 16).

20. In the December 13, 1993 order, the PUC stated:

neously with revenue loss, in permitting dollar-for-dollar recovery of the deferred lost revenues." (OCA brief, pp. 15–16).

The PUC contends that the allowance of lost revenue recovery is authorized under Section 1319 of the Code, which states "the commission shall allow the public utility to recover all prudent and reasonable costs associated with the development, management, financing and operation of the program". As to the difficulty in measuring lost revenues, the PUC contends that this issue will be addressed in the base rate proceedings when the utilities seek recovery for lost revenue.[19]

While we do not address whether recovery of lost revenues is authorized as DSM costs "associated with the development, management, financing and operation of the program" under Section 1319 because it was not an issue raised by the Industrial Coalition, we agree with the PUC that whether the manner of recovery violates the Code is not yet ripe for determination. The Industrial Coalition asserts that no calculation of lost revenues could accurately determine what revenues were lost due solely to a DSM program. While we agree, as did the PUC, that lost revenues are difficult to measure, there is the possibility that a sufficiently reliable calculation could be developed. Until the PUC develops a calculation for the award of lost revenues, whether a non-speculative calculation can be developed is too speculative to consider and the matter is not yet ripe for review.

 We also cannot determine whether or not the award of lost revenues will result in unjust and unreasonable rates by ignoring increases in revenues from other sources, as argued by the OCA. Although we would read the PUC's order[20] to mean that lost revenues, as part of a balancing account,

In considering this issue, we concur with the ALJ's recommendation to not permit the recovery of lost revenues through the DSM surcharge mechanism, but rather in base rate proceedings.... we feel it necessary to require that these costs be recovered through a base rate proceeding so that they are based on actual program results, as verified through the

were to be offset by other factors in the base rate case, the parties, including the PUC, apparently do not read it that way. Again, the issue is not yet ripe for judicial review.

We remand the case for the PUC either to consider this matter in this proceeding or to determine that it is appropriate to defer the matter to later cases, such as the approval of DSM programs or a base rate case involving a balancing account. When the issue is before the PUC, they should fully address their power to award lost revenues, how to calculate lost revenues and how recovery is affected if overall revenues increase. If the parties appeal that decision, it can be properly reviewed at that time.

Because Section 523 of the Code does not permit the recovery of incentives outside of a base rate case and the calculation for incentives was not supported by substantial evidence in the record, we will reverse those parts of the PUC's December 13, 1993 order, in addition to the allowance of costs for physical facilities through a surcharge. We affirm all other parts of the order but remand because the issue of lost revenues is not yet ripe for judicial review. Additionally, we vacate the April 8, 1994 order of the PUC reconsidering its prior order.

### ORDER

AND NOW, this 9th day of January, 1995, the order of the Pennsylvania Public Utility Commission, dated December 13, 1993, No. I–900004, is affirmed, except to that part allowing recovery of incentives and costs of physical facilities through the surcharge mechanism and adopting the calculation for incentives, which is reversed. We remand the case on the lost revenue issue. It is also ordered that the Pennsylvania Public Utility Commission order dated April 8, 1994, in the same matter, is vacated in accordance with the attached opinion.

Jurisdiction relinquished.

ratemaking process.... we will permit the utilities to use a balancing account for the lost revenue costs, and they will be treated as regulatory assets.