IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lancaster County Agricultural      :
Preserve Board      :
     :
         v.      :
     :
Doris F. Fryberger, Quarryville Resorts,   :
LP, and Benjamin Flahart,      :    No. 684 C.D. 2020
             Appellants      :    Argued: April 15, 2021


BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION
BY JUDGE FIZZANO CANNON         FILED: May 26, 2021


       Doris Fryberger (Fryberger), Quarryville Resorts, LP (Quarryville), and Benjamin Flahart (Flahart) (collectively, Contracting Parties) appeal from two orders entered on June 25, 2020, by the Court of Common Pleas of Lancaster County (trial court). In one order (Order 1), the trial court denied the summary judgment motion filed by the Contracting Parties. In the other order (Order 2), the trial court granted the summary judgment motion filed by the Lancaster County Agricultural Preserve Board (Board) on all claims asserted by the Board. In Order 2, the trial court enjoined the Contracting Parties from pursuing an easement agreement under which Quarryville would discharge treated wastewater through an irrigation system to be installed on farmland (Farm) belonging to Fryberger and managed by Flahart. The trial court also enjoined Quarryville from making any proposed ancillary use of any part of the Farm.

On review, we affirm Orders 1 and 2 in part, reverse in part, and vacate and remand in part.

## I. Background

Fryberger owns a 120-acre[1] Farm in Lancaster County which is managed by Flahart, her son. Reproduced Record (R.R.) 487a, 504a, 507a, & 887a. The Farm currently has no irrigation system because of the expense of such a system. R.R. 491a-92a & 495a-97a.

In 2003, Fryberger's predecessor-in-title entered into an agricultural conservation easement agreement (Conservation Easement)[2] with the Commonwealth of Pennsylvania (Commonwealth), approved by the State Agricultural Land Preservation Board (State Board), regarding the Farm. R.R. 886a-93a. The Conservation Easement generally restricts use of the Farm to agricultural production. R.R. 887a. However, the Conservation Easement also permits "construction or use of any building or other structure for agricultural production . . . ." R.R. 888a. Use of an irrigation system is not prohibited.[3] *See* R.R. 621a-26a, 636a-37a, & 886a-93a. In addition, the Conservation Easement expressly allows Rural Enterprises, which it defines as "[c]ustomary part-time or off-season minor or

---

[1] The record contains minor variations in statements of the Farm's acreage that are not material here. For purposes of this opinion, we approximate the acreage recited in the agricultural conservation easement agreement between the Commonwealth and Fryberger's predecessor. Reproduced Record (R.R.) 887a.

[2] Agricultural conservation easements are authorized and governed by the Agricultural Area Security Law, Act of June 30, 1981, P.L. 128, *as amended*, 3 P.S. §§ 901-915.

[3] The Board's Permitted Rural Enterprises, as approved by the State Board in 2010, expressly include "[s]tructures and facilities associated with irrigation . . . ." https://co.lancaster.pa.us/DocumentCenter/View/142/Program-Guidelines-revised-Jan-2010 at E-1 ¶ 2 (last visited May 25, 2021).

rural enterprises and activities which are provided for in the County Agricultural Easement Purchase Program approved by the State Board . . . ." R.R. 889a.[4]

In 2013, the Board developed its Rural Enterprises Guidelines regarding ancillary land uses permitted under agricultural conservation easements (Guidelines), which were amended in 2014. R.R. 1054a-59a; Bd.'s Br. at 55. The purpose of the Guidelines is to allow owners of land subject to agricultural conservation easements to "supplement farm incomes in a manner which will not adversely affect the use of preserved farmland for agricultural production and to create a healthy environment for the long-term sustainability of the agricultural economy and farming as a way of life." R.R. 1054a. The Guidelines facially apply to Rural Enterprises allowed by the Agricultural Area Security Law, Section 14.1,[5] which specifically provides: "An agricultural conservation easement shall not prevent . . . [c]ustomary part-time or off-season minor or rural enterprises and activities which are provided for in the county Agricultural Conservation Easement Purchase Program approved by the State [B]oard . . . ." 3 P.S. § 914.1(c)(6)(v). The Guidelines include a provision that any Rural Enterprise conducted on a farm subject to an agricultural conservation easement must not detract from the required primary use of the land and must be owned or operated by the landowner. R.R. 1054a. The Guidelines also require advance Board approval before commencing any Rural Enterprise. R.R. 1056a.

---

[4] The reproduced record does not include any information designated as the contents of the County Agricultural Easement Purchase Program as approved by the State Board. However, the Agricultural Conservation Easement Program Guidelines referenced in note 3, *supra*, have been approved by the State Board.

[5] Added by Act of December 14, 1988, P.L. 1202.

3

Notably, the 2003 Conservation Easement did not incorporate or otherwise reference the Guidelines, which would not be promulgated by the Board for another 10 years.[6] *See generally* R.R. 1054a-59a.

Quarryville owns a campground and resort facility on property adjacent to the Farm. R.R. 14a. Quarryville is contemplating an increase in the number of its campsites and anticipates a corresponding need for increased on-site sewage facilities. R.R. 127a. Quarryville approached Flahart with a proposal for a mutually beneficial arrangement in which Quarryville would treat its sewage waste on site and then discharge the treated wastewater on part of the Farm through a pivot spray irrigation system Quarryville would install at its own expense. R.R. 498a-99a, 504a, & 524a. Quarryville's plan also called for placement of four monitoring wells in the ground on the Farm to assure compliance with applicable regulations concerning quality of the wastewater. R.R. 521a. The monitoring wells would be part of the irrigation equipment and would be placed so as to avoid any interference with farming operations. R.R. 516a.

Quarryville and Flahart eventually reached an easement agreement for the installation of the irrigation system and associated monitoring wells on a portion of the Farm (Irrigation Easement). R.R. 132a-46a. The Irrigation Easement would require Quarryville to comply with all state and federal limitations applicable to the

---

[6] The Conservation Easement does incorporate and is subject to the Subdivision Guidelines of the County of Lancaster Agricultural Land Preservation Program, as approved by the State Board on December 13, 2001. R.R. 892a. The referenced subdivision guidelines have a stated intent to "preserve as much farmland as possible in integral tracts and to promote viable agricultural enterprises." R.R. 901a. However, the subdivision guidelines, as their designation suggests, relate to requests to subdivide land that is subject to an agricultural conservation easement, not to the permitted uses of such land. *See generally* R.R. 900a-04a.

Farm regarding use of effluent as fertilizer.[7]  *Id.*  It would also allow Flahart to use the irrigation system for watering crops using water from other sources in addition to the treated wastewater discharged by Quarryville.  R.R. 516a-17a & 581a.  The irrigation system would be movable and could also be programmed by computer to allow Flahart to control the system remotely.  R.R. 510a-11a & 527a. Implementation of the Irrigation Easement would require approval from the Pennsylvania Department of Environmental Protection (DEP) and other governmental and local authorities.  R.R. 134a.

In addition, the Irrigation Easement would allow Quarryville to use a small section of land on the Farm, 300 x 600 feet, "to grow crops for its own use and conduct additional ancillary activities."  R.R. 134a.  For example, in October 2017 and 2018, Quarryville used a small portion of the Farm for a "haunted trail" or corn maze through an existing cornfield.[8]  R.R. 503a, 531a, & 651a.  Quarryville also caused or allowed some recreational vehicles (RVs) to be parked on the land[9] and placed a temporary haunted house structure or tent there.[10]  R.R. 945a.  Quarryville has not placed any RV, corn maze or trail, tent, or other temporary structure on the Farm since 2018.  R.R. 529a & 663a.  The Board alleged that Quarryville also

---

[7] Evidence indicated that applicable environmental standards require the treated wastewater discharged on the Farm to be at least as clean as river water.  R.R. 149a.

[8] Corn mazes are among the Rural Enterprises generally permitted on farms subject to agricultural conservation easements.  R.R. 647a-48a & 1058a.

[9] Quarryville's witness stated in her deposition testimony that she saw "numerous" RVs. R.R. 923a.  The photograph she submitted in evidence in support of her statement appears to show several RVs.  R.R. 945a.  In his deposition testimony, Quarryville's representative, Allen S. Blank (Blank), conceded the photo might show five or six RVs.  R.R. 1142a.

[10] In his deposition testimony, Flahart stated he gave permission for the corn maze; he disclaimed knowledge of the temporary structures but did not state any objection to them.  R.R. 880a-81a.  He was aware of the RVs and did not object.  *Id.*

5

allowed RV camping and/or sales on the Farm, but Quarryville denied such activities, explaining that a few RVs were simply parked on one edge of the Farm "while not in use." R.R. 1090a (answer to summary judgment motion) & 1097a (answer to requests for admission). Similarly, the Board alleged that Quarryville also advertised numerous other autumn activities. *See* R.R. 1061a-62a (copy of alleged on-line advertisement). However, the advertisement did not indicate that those activities were occurring on the Farm. *Id.* Quarryville maintained only the corn maze was located on the Farm. R.R. 1099a (answers to requests for admissions). The Board offered no contrary evidence. Thus, the record contains no evidence of any activities on the Farm by Quarryville other than the corn maze, along with a related tent or temporary structure, and a few parked RVs.

The Board learned of the Irrigation Easement when East Drumore Township contacted the Board for guidance after Quarryville submitted a planning module seeking approval of its proposed sewage disposal system, which included the irrigation system. R.R. 16a; Bd.'s Br. at 20. During an inspection of the Farm in October 2018, the Board's representative also noted the presence of a "corn maze" with "props and decorations," as well as RVs and a structure or tent on the Farm. R.R. 97a-99a, 530a, 923a, & 945a-50a.

In October 2018, the Board filed a four-count civil complaint[11] against the Contracting Parties: Count I asserted breach of contract by Fryberger; Count II sought a declaratory judgment and injunctive relief against Fryberger and Quarryville alleging violations of the Conservation Easement; Count III asserted a quiet title action against Fryberger and Quarryville; and Count IV asserted a claim

---

[11] Under Section 14.1 of the Agricultural Area Security Law, the Board has primary authority to enforce the terms of agricultural conservation easements in Lancaster County. 3 P.S. § 914.1(b).

of tortious interference with the Conservation Easement by Quarryville and Flahart. R.R. 5a-100a. The Contracting Parties asserted a counterclaim seeking a declaration that the Irrigation Easement did not violate the Conservation Easement. R.R. 101a-86a.

The parties subsequently filed cross-motions for summary judgment. R.R. 466a-700a & 714a-1062a. In Order 1, the trial court denied the Contracting Parties' motion. R.R. 1168a. In Order 2, the trial court granted the Board's motion for judgment as to "all claims." R.R. 1169a-70a. Order 2 declared the Irrigation Easement void *ab initio* and enjoined the Contracting Parties from "the construction of the sewage system and related facilities on the Fryberger Property and the discharge of effluent under the [Irrigation] Easement," as well as from ancillary activities authorized under the Irrigation Easement. R.R. 1170a. The Contracting Parties timely appealed Orders 1 and 2 on July 16, 2020. R.R. 1203a-04a.

On July 8, 2020, the Board filed a petition in the trial court seeking a hearing to fix the amount of attorneys' fees it would be entitled to recover as the prevailing party,[12] pursuant to the terms of the Conservation Easement. R.R. 891a & 1171a-1201a. On September 9, 2020, the trial court entered an order (Order 3), without an accompanying opinion, stating that Order 2 granted summary judgment in the Board's favor only on Counts I to III of the complaint. R.R. 1523a.

---

[12] In *Ness v. York Township Board of Commissioners*, 123 A.3d 1166 (Pa. Cmwlth. 2015), this Court explained that where a prevailing party seeks its counsel fees more than 30 days after the trial court's final order in the case, the trial court lacks jurisdiction to grant relief. *Id.* at 1168 (citing Section 5505 of the Judicial Code, 42 Pa. C.S. § 5505). Thus, the Board was constrained to file its fee petition within 30 days after the trial court entered Orders 1 and 2 on June 25, 2020, notwithstanding the possibility that the Contracting Parties would appeal those orders.

7

Based on the trial court's entry of Order 3, this Court directed the parties to address in their appellate briefs the effect of Order 3, as well as the appealability of Orders 1 and 2 in light of Order 3.

## II. Issues on Appeal

On appeal,[13] the Contracting Parties present several issues, which we combine and paraphrase as follows. First, in response to this Court's directive concerning Order 3, the Contracting Parties argue that Orders 1 and 2 were final and appealable despite the trial court's subsequent attempt to amend Order 2. Moreover, once the Contracting Parties filed their Notice of Appeal of Orders 1 and 2, the trial court lacked authority to enter Order 3.

On the merits, the Contracting Parties contend that the trial court erred in granting summary judgment and injunctive relief to the Board on its claims and denying summary judgment to the Contracting Parties on their counterclaim with regard to the irrigation system. The Contracting Parties observe that the Conservation Easement permits agricultural activities and structures. The Contracting Parties assert that all of the activities and structures contemplated by the Irrigation Easement in connection with the irrigation system constitute such permissible agricultural activities and structures. Thus, the Contracting Parties argue

---

[13] Our review of a trial court's order granting summary judgment is *de novo*, and our scope of review is plenary; this Court applies the same standard for summary judgment as the trial court. *Kadar-Kallen v. Old Iron Ests. Homeowners Ass'n*, 243 A.3d 1001, 1005 n.5 (Pa. Cmwlth. 2020) (citing *Gior G.P., Inc. v. Waterfront Square Reef, LLC*, 202 A.3d 845, 852 n.10 (Pa. Cmwlth. 2019); *Cochrane v. Kopko*, 975 A.2d 1203, 1205 (Pa. Cmwlth. 2009)). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Kadar-Kallen*, 243 A.3d at 1005 n.5 (citing *Farabaugh v. Pa. Tpk. Comm'n*, 911 A.2d 1264, 1267 n.3 (Pa. 2006)).

that the installation and operation of the proposed irrigation system on the Farm is consistent with and does not violate the Conservation Easement.

Further, the Contracting Parties assert error by the trial court in enjoining ancillary activities on the Farm by Quarryville. The Contracting Parties suggest the Board's complaints regarding ancillary activities are moot because no such activities have occurred since 2018. The Contracting Parties also posit that in any event, the ancillary activities contemplated in the Irrigation Easement would not violate the Conservation Easement because they are permitted as customary part-time or off-season minor or rural enterprises and activities.

### III. Discussion

### A. Effect of Order 3

The Contracting Parties first assert that Orders 1 and 2 were final and appealable when issued. We agree.

The Board repeatedly attempts to recast both its summary judgment motion and Order 2 granting that motion as involving judgment on liability only. *See* Bd.'s Br. at 31-33, 37-41, 53. However, the record belies the Board's characterization. The complaint itself requested declaratory and injunctive relief, but not damages; rather, it sought only "reasonable attorneys' fees and other recoverable costs." R.R. 23a. Even assuming, *arguendo*, that an attorneys' fee award constitutes damages, the Board's summary judgment motion sought judgment on "all claims," without suggesting or even mentioning bifurcation into liability and damages segments. R.R. 714a-19a. Order 2 likewise granted summary judgment in favor of the Board on "all claims," without any suggestion that a damages phase was to follow as to which judgment had been withheld. R.R. 1169a-70a.

9

A petition seeking an award of attorneys' fees as a prevailing party, where authorized by applicable law, is a post-judgment proceeding that does not affect the finality of the order to which it relates:

> The [Pennsylvania] Supreme Court has held that, so long as a motion for attorneys' fees has been timely filed, a trial court may act on that motion under [Pa. R.A.P. 1701](b)(1) even after an appeal has been taken. *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 48 (Pa. 2011). Thus, . . . an award of attorneys' fees constitutes a separately appealable order that would be reviewable upon filing of a timely separate notice of appeal, measured from the date the fee award order was entered.

Pa. R.A.P. 1701, Official Note.

*Samuel-Bassett*, cited in the Official Note to Rule 1701 of the Pennsylvania Rules of Appellate Procedure, involved a statutory entitlement to fees. After the plaintiffs in a class action prevailed in a jury trial, their counsel filed a fee petition. Notably, the authorizing statute stated that fees were to be awarded "as part of the judgment." *Samuel-Bassett*, 34 A.3d at 48 (quoting 15 U.S.C. § 2310(d)(2)). Thus, in *Samuel-Bassett*, as in this case, the entitlement to fees, although not their amount, was implicit in the entry of judgment. However, neither the jury's verdict nor the trial court's subsequent order molding the verdict to calculate damages referred to an attorneys' fee award. *See Samuel-Bassett*, 34 A.3d at 48. The defense argued that because of that, a separate fee petition filed after entry of judgment was improper and the trial court lacked jurisdiction to decide it. Our Supreme Court disagreed. The Court observed that Pennsylvania courts have "a strong interest in the preservation of consistency and predictability in the operation of our appellate process." *Id.* Accordingly, the Court concluded the uniform rule in Pennsylvania is that a petition for attorneys' fees, whether or not viewed as part of the judgment, is

10

an ancillary procedure over which the trial court retains jurisdiction after entry of judgment. *Id.*

Accordingly, the Board is incorrect in attempting to paint its post-judgment fee petition as an outstanding claim for damages that rendered Order 2 interlocutory. After the trial court granted all of the Board's requests for declaratory and injunctive relief, no claims remained outstanding.

We therefore conclude that Orders 1 and 2 were final and appealable when entered. We next consider the trial court's authority to amend Order 2 after it had been appealed.

As a general rule, "after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter." Pa. R.A.P. 1701(a). The trial court may still "correct formal errors in papers relating to the matter, . . . and take other action permitted or required by these rules or otherwise ancillary to the appeal or petition for review proceeding." Pa. R.A.P. 1701(b)(1). However,

> [t]he power to clarify or correct does not extend to substantive modifications. *See Pa. Indus. Energy Coal[.] v. [Pa. Pub. Util. Comm'n]*, 653 A.2d 1336, 1344-45 (Pa. Cmwlth. 1995), *aff'd*, 670 A.2d 1152 (Pa. 1996). Examples of permissible actions to preserve the *status quo* are those "auxiliary to the appellate process, such as a supersedeas or injunction." *Id*. Examples of permissible corrections are "non-substantial technical amendments to an order, changes in the form of a decree, and modification of a verdict to add prejudgment interest." *Id*. at 1344. "Such actions have no effect on the appeal or petition for review and cannot prompt a new appealable issue." *Id*. at 1345.

Pa. R.A.P. 1701, Official Note.

11

Here, there is no dispute that the Contracting Parties appealed Orders 1 and 2 on July 16, 2020. *See* R.R. 1203a. A threshold issue in this appeal is whether the trial court retained jurisdiction to enter Order 3, which purported to alter Order 2's grant of summary judgment on "all claims" to grant judgment only on Counts I-III. *See* R.R. 1169a-70a & 1523a.

Order 3, which purported to remove one count of the Board's complaint from Order 2, was not entered as a preservation of the *status quo*. It cannot be described as merely correcting a formal error, nor did the trial court purport to characterize it as such. Order 3 was not permitted or required by the Rules of Appellate Procedure. It was not ancillary to this appeal. It did not enforce a prior order or grant a timely request for reconsideration of such an order. It was not proceeding further in a matter where a non-appealable interlocutory order had been entered. In short, Order 3 did not fit within any of the exceptions under Pa. R.A.P. 1701(b)(1)-(6) allowing a trial court to retain jurisdiction to act after an appeal of its final order. *See* Pa. R.A.P. 1701(b)(1)-(6).

Moreover, even had the Contracting Parties failed to appeal, the trial court would still have lacked jurisdiction to alter Order 2 more than 30 days after its entry. Section 5505 of the Judicial Code provides that "[e]xcept as otherwise provided or prescribed by law, a court upon notice to the parties[14] may modify or rescind any order *within 30 days after its entry*, . . . if no appeal from such order has been taken or allowed." 42 Pa. C.S. § 5505 (emphasis added); *see Ness v. York Twp. Bd. of Comm'rs*, 123 A.3d 1166, 1169 n.3 (Pa. Cmwlth. 2015) (quoting 42 Pa. C.S. § 5505). Thus, even in the absence of an appeal, "a trial court lacks authority to

---

[14] The reproduced record does not indicate whether the trial court gave notice to the parties of its intent to alter Order 2.

12

award additional relief sought more than 30 days after its final order in a case." *Ness*, 123 A.3d at 1169 (additional citations omitted).

Having been entered more than 30 days after Orders 1 and 2, and after the Contracting Parties had appealed those orders, Order 3 was a nullity. *See Murphy v. Dep't of Transp.*, 733 A.2d 688, 690 n.3 (Pa. Cmwlth. 1999) (trial court's order reversing its previous order sustaining the Commonwealth's preliminary objections was a nullity where it was entered after the 30-day appeal period from the first order); *Dwight v. Girard Med. Ctr.*, 623 A.2d 913, 916-17 (Pa. Cmwlth. 1993) (notwithstanding that trial court erred in prematurely granting summary judgment, it was without jurisdiction to enter an order effectively reinstating the claim after the summary judgment order had been appealed); *Mun. Council of Monroeville v. Kluko*, 517 A.2d 223, 225 (Pa. Cmwlth. 1986) (where trial court issued order granting appellees' fee petition more than 30 days after issuing final order stating appellees were responsible for their fees, and where trial court provided no opinion or other indication that the second order was a correction of a formal error, the second order was a nullity).

We agree with the Contracting Parties that the trial court lacked jurisdiction to alter its prior judgment. Because Orders 1 and 2 were final and appealable, once the Contracting Parties appealed them on July 16, 2020, the trial court no longer had jurisdiction to alter those orders. *See* Pa. R.A.P. 1701(a). Moreover, the trial court lacked jurisdiction to alter Order 2 once 30 days had passed after entry of that order. *See* 42 Pa. C.S. § 5505.

Accordingly, we proceed to the merits of the appeal.

## B. Restrictions under the Conservation Easement

Easements are construed under the same principles of interpretation that apply to other contracts. *Sigal v. Mfrs. Light & Heat Co.*, 299 A.2d 646, 649 (Pa. 1973). If there is any doubt as to the meaning of a term, it should be construed to have a reasonable meaning in accord with the intention of the parties. *Id.* To ascertain that intention, the court must "consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract . . . ." *Id.*; *see also Zettlemoyer v. Transcon. Gas Pipeline Corp.*, 657 A.2d 920, 924 (Pa. 1995) (citing *Sigal*).

"Ordinarily, when a tract of land is subject to an easement, the servient owner may make any use of the land that does not unreasonably interfere with the use and enjoyment of the easement." *Ephrata Area Sch. Dist. v. Cnty. of Lancaster*, 886 A.2d 1169, 1176 (Pa. Cmwlth. 2005), *rev'd on other grounds*, 938 A.2d 264 (Pa. 2007)[15] (citing James W. Ely, Jr. and Jon W. Bruce, *The Law of Easements and Licenses in Land*, § 8:17 (2005)). The grantor of an easement generally retains all rights in the property not conveyed in the easement and "may grant additional easements in the same strip of land, provided such action does not impair the interests of the first easement holder. . . . These general rules also apply where the servient tenement is burdened by a conservation easement." *Ephrata Area Sch. Dist.*, 886 A.2d at 1176 (additional citations omitted).

The purposes of agricultural conservation easements are set forth in Section 2 of the Agricultural Area Security Act:

---

[15] Our Supreme Court reversed based on its conclusion that under both Section 11(a) of the statute known as the Open Space Lands Act, Act of January 19, 1968, P.L. (1967) 992, *as amended*, 32 P.S. § 5011(a), and the specific terms of the open-space conservation easement at issue, advance approval by the County was required for a right-of-way over preserved farmland for a school district's access road; such a use was unquestionably neither agricultural nor directly associated with agriculture. *Ephrata Area Sch. Dist. v. Cnty. of Lancaster*, 938 A.2d 264, 272-73 (Pa. 2007).

It is the declared policy of the Commonwealth to conserve and protect and to encourage the development and improvement of its agricultural lands for the production of food and other agricultural products. It is also the declared policy of the Commonwealth to conserve and protect agricultural lands as valued natural and ecological resources which provide needed open spaces for clean air, as well as for aesthetic purposes. Article VIII, section 2 of the Constitution of Pennsylvania [Pa. Const. art. VIII, § 2] provides that the General Assembly may, by law, establish standards and qualifications for agricultural reserves. Agriculture in many parts of the Commonwealth is under urban pressure from expanding metropolitan areas. This urban pressure takes the form of scattered development in wide belts around urban areas, and brings conflicting land uses into juxtaposition, creates high costs for public services, and stimulates land speculation. When this scattered development extends into good farm areas, ordinances inhibiting farming tend to follow, farm taxes rise, and hopes for speculative gains discourage investments in farm improvements. Many of the agricultural lands in the Commonwealth are in jeopardy of being lost for any agricultural purposes. Certain of these lands constitute unique and irreplaceable land resources of Statewide importance. It is the purpose of this act to provide means by which agricultural land may be protected and enhanced as a viable segment of the Commonwealth's economy and as an economic and environmental resource of major importance.

It is further the purpose of this act to:

(1) Encourage landowners to make a long-term commitment to agriculture by offering them financial incentives and security of land use.

(2) Protect farming operations in agricultural security areas from incompatible nonfarm land uses that may render farming impracticable.

(3) Assure permanent conservation of productive agricultural lands in order to protect the agricultural economy of this Commonwealth.

(4) Provide compensation to landowners in exchange for their relinquishment of the right to develop their private property.

(5) Leverage State agricultural easement purchase funds and protect the investment of taxpayers in agricultural conservation easements.

(6) Encourage financial partnerships between State and local governments with nonprofit entities in order to increase the funds available for agricultural conservation easement purchases.

3 P.S. § 902. In furtherance of these purposes, a municipality where an agricultural security area is created must encourage the viability of agriculture in that area, "by not enacting local laws or ordinances which would unreasonably restrict farm structures or farm practices within the area in contravention of the purposes of this act . . . ." Section 11 of the Agricultural Area Security Act, 3 P.S. § 911(a). The Secretary of Agriculture, of the Department of Agriculture, is empowered and directed to promulgate rules and regulations aimed at promoting "uniform and [s]tatewide administration" of the Agricultural Area Security Act. Section 15 of the Agricultural Area Security Act, 3 P.S. § 915.

The Board has never previously objected to the installation of an irrigation system on a farm subject to an agricultural conservation easement in Lancaster County. R.R. 625a-26a. To the contrary, the Board acknowledges irrigation as accepted and "necessary" for farming, specifically for Lancaster County farms, including those subject to agricultural conservation easements. R.R. 622a-23a & 626a. Indeed, the Board concedes it allows irrigation of farms subject to agricultural conservation easements. R.R. 621a, 624a-25a, 636a, & 646a. However, the Board strenuously opposes the Irrigation Easement here. We find the Board's reasoning for doing so unpersuasive.

16

The Board's essential objection is based on its unilateral conclusion that the sole purpose of the Irrigation Easement is disposal of waste by Quarryville. Bd.'s Br. at 45. In the Board's view,

> [t]he use of sewage effluent as an unneeded partial irrigation system is a convenient cover for the improper sole purpose, which is a non-agricultural use. In the normal scenario, a farmer in an area that needs irrigation for farming to be profitable, invests hundreds of thousands of dollars to install a center pivot irrigation system that he/she will own, control and utilize for growing crops. In Lancaster County, the cost of expensive irrigation systems is not economically justified by the modest increased crop yield. Here, Mr. Flahart is being paid to let a neighboring commercial property owner construct, control, own, prioritize and utilize a center pivot system to spread its wastewater onto the . . . Farm.

*Id.* Thus, the Board's objection to the Irrigation Easement is based on its position that the proposed irrigation system is not necessary or economically justified by the amount of crop yield increase it would generate. From this premise, the Board concludes the Irrigation Easement is a subterfuge that benefits only Quarryville. This position is untenable.

The Conservation Easement does not preclude an otherwise permitted use just because it also benefits a third party.[16] Nonetheless, the Board contends the Irrigation Easement violates the "agricultural purpose" limitation of the Conservation Easement because it benefits Quarryville's interests as well as those

---

[16] *Tinicum Township v. Nowicki*, 99 A.3d 586 (Pa. Cmwlth. 2012), cited by the Board, is inapplicable. In *Nowicki*, a mulching operation on a farm was deemed not an agricultural operation protected by the statute known as the Right to Farm Act, Act of June 10, 1982, P.L. 454, *as amended*, 3 P.S. §§ 951-957, because the raw materials did not come from the farm *and the mulch produced was not used on the farm. Tinicum Twp.*, 99 A.3d at 592. Here, the treated wastewater would not come from the Farm, but it certainly would be used on the Farm, as the Board concedes. *See* Bd.'s Br. at 48. Moreover, unlike the mulch in *Nowicki*, the wastewater is not being produced on the Farm for resale as a product.

of the Farm. Bd.'s Br. at 34; *see* R.R. 633a-35a & 642a-43a. The Board observes that "but for Quarryville['s] desire to expand its commercial operation (and profits), the proposed irrigation of the . . . Farm would never exist." Bd.'s Br. at 34. That is not the applicable standard. There is no legal or rational reason to preclude an otherwise permissible benefit to farmland subject to an agricultural conservation easement on the basis that the proposed benefit also, or even primarily, benefits a third party as well.

Likewise, the Board's implied concern about the propriety or efficacy of Quarryville's wastewater as fertilizer on the Farm is not a justification for the Board to insert itself into Flahart's decisions about how to operate the Farm. June Mengel (Mengel), a farmland preservation specialist for the Board, inquired of DEP and learned that it approves the use of treated wastewater in spray irrigation systems on farms. R.R. 657a-59a. In other research and inquiries, Mengel further confirmed the propriety of spray irrigation using treated wastewater in agricultural operations. R.R. 662a & 669a. Nothing in the Conservation Easement suggests the Board has authority to exert any control over decisions about fertilizer usage at the Farm, as that is a normal agricultural activity. *Accord Gilbert v. Synagro Cent., LLC*, 131 A.3d 1, 17-23 (Pa. 2015) (explaining that application of biosolids as fertilizer on farmland is a "normal agricultural operation" as defined in Section 4(a) of the Right to Farm Act, 3 P.S. § 954(a)).[17]

---

[17] The legislative intent underlying the Agricultural Area Security Act, set forth above, is consistent with the following policy underlying the Right to Farm Act:

> It is the declared policy of the Commonwealth to *conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products.* When nonagricultural land uses extend into agricultural areas, agricultural operations often become the subject of nuisance

18

Further, the Board ignores the record evidence concerning the benefits to the Farm from the proposed irrigation system. Regarding the Board's assertion that irrigation is not needed, Flahart testified that the summer of 2018 was so dry that the Farm's corn crop "burnt up." R.R. 493a. He plans to irrigate the rest of the Farm and hopes it will be done within his lifetime. R.R. 504a. Flahart testified that his son-in-law's farm, also in Lancaster County, has an irrigation system using a center pivot system that obtains water from sources including a manure lagoon. R.R. 494a-95a. Assuming, *arguendo*, that an irrigation system for the Farm might not be affordable or cost-effective if Flahart had to pay for it, he could reasonably conclude that the free use of an irrigation system, along with free fertilizer and annual payments from Quarryville, would benefit the Farm.

---

suits and ordinances. As a result, agricultural operations are sometimes forced to cease operations. Many others are discouraged from making investments in farm improvements. *It is the purpose of this act to reduce the loss to the Commonwealth of its agricultural resources* by limiting the circumstances under which agricultural operations may be the subject matter of nuisance suits and ordinances.

Section 1 of the Right to Farm Act, 3 P.S. § 951 (emphasis added).

In *Gilbert v. Synagro Central, LLC*, 131 A.3d 1 (Pa. 2015), our Supreme Court concluded this statutory purpose under the Right to Farm Act cannot be achieved by permitting "an idiosyncratic determination of a farming practice's 'normality' . . . based on varying local perceptions of what constitutes a "normal agricultural operation . . . ." *Id.* at 17. To the contrary, the statute was intended to be read expansively so as to provide a "meaningful degree of legal certainty, uniformity, and consistency . . . to farms." *Id.* at 18.

The Court in *Gilbert* also stated that in determining whether an activity is a "normal agricultural operation," the focus is "on the practice in general, not on whether the defendant in this particular instance conducted the practice in accordance with accepted industry standards and regulations . . . ." *Gilbert*, 131 A.3d at 19-20. "The legislative goal is to protect and encourage farming innovation . . . to include technological advancement in fertilizing methods, such as the use of biosolids . . . ." *Id.* at 20-21.

We believe the same reasoning applies to distribution of treated wastewater through an irrigation system, and its permissibility under the Agricultural Area Security Act.

19

The Board also suggests that the amount of effluent sprayed on the Farm through the irrigation system could overwater and destroy crops in a wet year. Bd.'s Br. at 48. That assertion is purely speculative and has no support. In fact, the record contains evidence, not refuted by the Board, that the wastewater would be only a minimal part of the water needed or used for irrigation by the Farm. R.R. 516a. Moreover, the record indicates that Quarryville's discharge of wastewater would conform to the Farm's nutrient management plan. R.R. 15a.

In addition, the Board argues the four monitoring wells associated with the irrigation system are not permitted under the Conservation Easement. Bd.'s Br. at 51. We reject this assertion. Inasmuch as spraying of effluent through an irrigation system is a method of fertilizing approved by DEP for Pennsylvania farms, R.R. 657a-59a, we have no difficulty in concluding that monitoring wells, as a necessary part of such a system, are included within the irrigation structure permitted under the Conservation Easement and the Agricultural Area Security Act. If Fryberger were paying for and taking ownership of the irrigation system, including the monitoring wells, their use would undoubtedly be permissible as necessary to comply with DEP regulations. We see no reason to distinguish that situation from the one here.[18]

The Board also contends that the Irrigation Easement violates Article 4 of the Conservation Easement, which allows utility easements, because Quarryville

---

[18] We note that it is not unusual for the seller of an expensive fixture, such as an irrigation system, to finance some or all of the purchase price using the fixture as collateral and perfecting its security interest by retaining title to the system pending payment of the purchase price. Division 9 of the Uniform Commercial Code, 13 Pa. C.S. §§ 9101-9809, expressly provides that the parties' rights and obligations regarding security interests "apply whether title to collateral is in the secured party or the debtor." 13 Pa.C.S. § 9202. Thus, the mere fact that title to the irrigation system would remain in Quarryville does not necessarily differentiate the Contracting Parties' arrangement from an actual purchase transaction.

is not a utility. Bd.'s Br. at 51-52. The Board insists the irrigation system would violate the utility easement provision, which allows utility easements "in and through" preserved farmland, because the irrigation pipes would not travel "in and through" the Farm. *Id.* at 52. The internal inconsistency of this argument is patent. Because Quarryville is not a utility, Article 4 is inapplicable; therefore, whether the irrigation pipes travel "in and through" the Farm is irrelevant. Moreover, although the Conservation Easement authorizes utility easements, it does not forbid other easements that are not inconsistent with its provisions. *See generally* R.R. 887a-92a.

In summary, the Irrigation Easement would provide an irrigation system and additional soil nutrients to a portion of the Farm at no expense to Fryberger. Moreover, Quarryville is willing to pay rental of $12,800 per year, plus a 2% annual increase, for the use of the irrigation system. R.R. 1536a (trial court's Pa. R.A.P. 1925(a) opinion). As the trial court observed, the purpose of the Agricultural Area Security Law is to offer incentives to owners of agricultural land and protect against incompatible nonfarm uses "that may render farming impracticable." R.R. 1532a (trial court's Pa. R.A.P. 1925(a) opinion at 2 n.1 (quoting 3 P.S. § 902(1) & (2)) (additional quotation marks omitted). The Board, however, would have the Farm lose an opportunity for added income and decreased costs, plus the benefit of the cost-free use of an irrigation system, merely because Quarryville would realize a mutual benefit.

The Irrigation Easement creates an arrangement by which Flahart can increase the Farm's production[19] and also add other income, all while cutting costs. Providing these benefits to the Farm can only serve to advance the Conservation

---

[19] For example, evidence was submitted that according to the United States Department of Agriculture, irrigated crops produced 34% higher yields overall than non-irrigated crops in 2017. R.R. 618a.

21

Easement's underlying purpose of preserving Pennsylvania farmland in productive use. That Quarryville also benefits from the Easement is of no moment. The parties have found a mutually beneficial arrangement that does not infringe the provisions of the Conservation Easement and is environmentally sound. The Board is not empowered to interfere with such arrangements.

### C. Part-Time or Off-Season Minor or Rural Enterprises

Finally, the Board contends an injunction is required to prevent future parking of RVs, erection of temporary structures, and other ancillary uses by Quarryville of any portion of the Farm. The Contracting Parties respond that a request for such relief is moot because Quarryville has made no such use of any part of the Farm since 2018. However, the issue is capable of repetition, especially in light of the provision of the Irrigation Easement expressly authorizing Quarryville to use a small section of the Farm "to grow crops for its own use and conduct additional ancillary activities." R.R. 134a.

The parties dispute what constitute permissible ancillary activities under the Conservation Easement. Quarryville has not provided any express assurances that, once it is entitled to exercise its rights under the Irrigation Easement, it will continue to refrain from any ancillary activities. We therefore agree with the Board that this issue is not moot. *See Driscoll v. Zoning Bd. of Adjustment*, 201 A.3d 265, 269 (Pa. Cmwlth. 2018) (issue is not moot where it is capable of repetition but likely to evade review because it will cease before it can be fully litigated).

In 2017 and 2018, Quarryville placed or allowed several RVs to be parked on the land, constructed a corn maze, and placed a tent or small temporary structure with haunted house type props. R.R. 503a, 531a, 651a, & 945a. The Board

objects to these activities, relying on its Guidelines, which provide that no Rural Enterprises are permitted without prior Board approval. *See* R.R. 1056a (requiring approval before commencing any Rural Enterprise).

We conclude, however, that both the Board and the trial court erred in relying on the Guidelines. As discussed previously, the Board did not promulgate the Guidelines until 2013, a decade after Fryberger's predecessor granted the Conservation Easement to the Commonwealth. R.R. 223a; Bd.'s Br. at 55. Neither the Commonwealth nor Fryberger's predecessor-in-title agreed to the limitations contained in the Guidelines. We find the Guidelines are inoperable to require the Contracting Parties to obtain advance Board approval for Rural Enterprises permitted under the Conservation Easement.[20]

In *Naylor v. Board of Supervisors of Charlestown Township*, 247 A.3d 1182 (Pa. Cmwlth. 2021), this Court considered the authority of a conservation trust and a township to require their advance approval for construction of a residence on historic property subject to an open space conservation easement granted under the Uniform Conservation Easement Act.[21] Because the easement at issue was created 15 years before the statute's enactment, we concluded that applying the statutory

---

[20] Notably, even the Board's statement of Permitted Rural Enterprises, as approved by the State Board in 2010, required preapproval only regarding incidental "part-time or off-season minor or rural enterprises and activities" such as "woodworking, welding, harness shops, kennels, manufacturing, processing and storage of agricultural supplies and equipment, and processing, storage and retail marketing of crops livestock and livestock products." https://co.lancaster.pa.us/DocumentCenter/View/142/Program-Guidelines-revised-Jan-2010 at E-2 ¶ 7 (last visited May 25, 2021). No earlier statement that could potentially apply to the Conservation Easement is contained in the reproduced record.

[21] "The Uniform Conservation Easement Act is a uniform law drafted by the National Conference of Commissioners on Uniform State Laws and approved and recommended for enactment in all the states." *Naylor v. Bd. of Supervisors of Charlestown Twp.*, 247 A.3d 1182, ____, slip op. at 13 n.10 (Pa. Cmwlth. 2021). It has not been directly adopted in Pennsylvania, but parts of the Uniform Environmental Covenants, 27 Pa. C.S. §§ 6501-6517, are based on the Uniform Conservation Easement Act. *See* 27 Pa. C.S. § 6505, Uniform Law Comment 3.

requirements to the easement "would create a significant impairment of contract, which is contrary to the federal and state constitutions." *Id.* at \_\_\_, slip op. at 29 (citing *Ass'n of Settlement Cos. v. Dep't of Banking*, 977 A.2d 1257 (Pa. Cmwlth. 2009)). We conclude that applying the Guidelines to the Conservation Easement here would give rise to a similarly improper impairment of contract.

Even if the Guidelines were applicable, they expressly offer corn mazes as an example of permissible Rural Enterprises. R.R. 1058a. The Board has not pointed to any other authority for its current requirement that every Rural Enterprise, even one that is undisputedly permissible under an agricultural conservation easement, must be approved by the Board before it may commence. *Accord Naylor*, 247 A.3d at \_\_\_, slip op. at 39 & 45-46 (the grantor of a conservation easement may use the land for any purpose that does not unreasonably interfere with the easement; a conservation easement does not bestow any "preemptive gatekeeping role" that would provide authority to require advance approval or disapproval of improvements to a preserved farm by the entity charged with enforcing the easement). Notably, there is no provision in the common law that supports such a preapproval requirement. "To the contrary, the universally accepted rule is that a servient owner may grant additional easements provided those easements do not unreasonably interfere with the rights of prior easement holders." *Ephrata Area Sch. Dist.*, 886 A.2d at 1177-78.

As for allowing Quarryville to grow crops on a small portion of the Farm, crops are not only permitted, they are the primary use of the Farm under the Conservation Easement. R.R. 887a. Thus, the Guidelines' restriction requiring Rural Enterprises to be owned or operated by the landowner is inapplicable to Quarryville's cultivation of crops for two reasons. First, as previously discussed,

24

the Guidelines are not part of the Conservation Easement. Second, the growing of crops is not a Rural Enterprise; it is the primary use of the Farm.

By contrast, the Board's request for injunctive relief against further parking of RVs and placement of temporary structures on the Farm by Quarryville is well taken. Those uses cannot reasonably be deemed ancillary either to agricultural production in general or the irrigation system in particular. Accordingly, we conclude the trial court did not err in enjoining Quarryville from any future parking of RVs or placement of tents or temporary structures on the Farm.

However, Order 2 goes further than enjoining the nonpermitted uses that Quarryville admits occurred on the Farm. The Board averred that RV sales, camping, or camp activities also occurred on the Farm, but Quarryville consistently averred that the RVs parked on a small part of the Farm were merely parked temporarily "while not in use." R.R. 1090a (answer to summary judgment motion) & 1097a (answer to requests for admission). Quarryville also denied the Board's assertion that the autumn activities advertised by Quarryville were taking place on the Farm. *See id.* 1061a-62a & 1099a. Nonetheless, the trial court included those activities in its injunction order.

If those additional uses never occurred, an order enjoining them would not be proper. *See Red Oak Water Transfer NE, LLC v. Countrywide Energy Servs., LLC* (C.C.P. Allegheny Cnty. No. GD 11-17598, filed July 16, 2012), 2012 Pa. Dist. & Cnty. Dec. LEXIS 236, at *40 (unreported) (injunction was overbroad, unduly restrictive, and not reasonably suited to abate offending activity, where offending activity enjoined was not present).[22] However, the record reveals a genuine issue of material fact as to whether Quarryville ever undertook those activities on part of the

_____

[22] Although we are not bound by decisions of courts of common pleas, we find the cited decision persuasive.

Farm. Therefore, we vacate that portion of the trial court's decision granting summary judgment on that issue, and remand for further proceedings.

## IV. Conclusion

Based on the foregoing discussion, we affirm Orders 1 and 2 to the extent that they enjoin future use of any portion of the Farm by Quarryville for parking RVs or erecting tents or other temporary structures. We vacate Orders 1 and 2 and remand for further proceedings to the extent that they enjoin use of any portion of the Farm by Quarryville for RV sales, camping, or autumn activities other than a corn maze. Orders 1 and 2 are otherwise reversed.

_____
CHRISTINE FIZZANO CANNON, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lancaster County Agricultural :
Preserve Board :
                        :
          v. :
                        :
Doris F. Fryberger, Quarryville Resorts, :
LP, and Benjamin Flahart, : No. 684 C.D. 2020
              Appellants :

## O R D E R

AND NOW, this 26th day of May, 2021, the order of the Court of Common Pleas of Lancaster County (trial court) dated June 25, 2020, denying the summary judgment motion of Doris F. Fryberger (Fryberger), Quarryville Resorts, LP (Quarryville), and Benjamin Flahart, is AFFIRMED to the extent that it denies authority for future use by Quarryville of any portion of the farm property owned by Fryberger (Farm) for parking of recreational vehicles or erection of temporary structures. The order is VACATED and this matter is REMANDED for further proceedings to the extent that it denies authority for future use of any portion of the Farm by Quarryville for RV sales, camping, or autumn activities other than a corn maze. The order is otherwise REVERSED.

The trial court's order dated June 25, 2020, granting the summary judgment motion of Lancaster County Agricultural Preserve Board is AFFIRMED to the extent that it enjoins future use by Quarryville of any portion of the Farm for parking of recreational vehicles or erection of temporary structures. The order is VACATED and this matter is REMANDED for further proceedings to the extent

that it enjoins future use of any portion of the Farm by Quarryville for RV sales, camping, or autumn activities other than a corn maze. The order is otherwise REVERSED.

Jurisdiction is relinquished.

_____
CHRISTINE FIZZANO CANNON, Judge