IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Eminent Properties LLC | : | |
| | : | |
| v. | : | No. 1255 C.D. 2024 |
| | : | Argued: May 6, 2025 |
| Allegheny County Health | : | |
| Department, | : | |
| Appellant | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER                    FILED:  July 18, 2025

Allegheny County Health Department (Department) appeals from the August 22, 2024 Order entered by the Allegheny County Court of Common Pleas (trial court), sustaining the appeal of Eminent Properties LLC (EP) and vacating the findings of a Department Hearing Officer.  For the reasons that follow, we reverse the trial court's Order.

## I.  BACKGROUND

EP owns one unit in a four-unit residential dwelling located at 2407 Park Hill Drive in the City of Pittsburgh (Property).  EP purchased the Property in July 2013 and operates it as a rental property.

Asia Nelson and Martin Roberson-King (together, Tenants) began leasing the Property from EP in October 2018.  In July 2022, the Department received a complaint from Tenants that there was no hot water at the Property.  After receiving additional complaints from Tenants, the Department conducted seven inspections of

the Property between August 2022 and February 2023. During that period, the Department sent multiple violation notices and two penalty warning letters to EP regarding the violations and its need to correct them by a date certain.

Between November 2022 and February 2023, the Department imposed four separate penalty assessments on EP, totaling $20,681.98, for the following violations of Article VI of the Department's Regulations, titled "Housing and Community Environment": § 629(A) (inoperable furnace during the heating season); § 630 (no running water); § 632(A) (toilet not secured to the floor); and § 662 (terminated electric service).[1]

---

[1] The Hearing Officer set forth the language of these regulations as follows:

[Article VI, §] 629(A): Every dwelling occupied during the heating season shall have heating facilities which are properly installed, maintained in a safe and good working condition, and capable of safely and adequately heating all habitable rooms, rooms containing a toilet, bathtub or shower, communicating corridors within dwelling units, and community corridors within rooming houses from rooming units to rooms containing a toilet, bathtub or shower.

[Article VI, §] 630: Every dwelling unit and rooming house shall be supplied with piped running potable water provided in an adequate amount to every required fixture connected with the water supply and drainage system as provided in [Article VI, §] 615B. Every dwelling within [250] feet of a public water supply shall be connected to that public water supply.

[Article VI, §] 632(A): Every gas pipe, water pipe, waste pipe, drain, vent, gas burning fixture, any required fixture connected with the water supply and drainage system, together with all connections to water, sewer or gas lines, shall be cleanable and shall be installed and maintained in good, sanitary condition, free from defects, leaks and obstructions, and in accordance with the Rules and Regulations of the Department. Any fixture required by this Article connected to the water supply system and/or sewerage system shall comply with the requirements of Article XV. Every kitchen sink, lavatory basin, bathtub, or shower required in [Article VI, §§] 633 through 635 shall be supplied with hot and cold piped running water.

**(Footnote continued on next page…)**

2

EP appealed the violation notices to the Department. EP asserted that the Property was unoccupied at the time the penalties were issued and had been unoccupied since at least July 15, 2022. Because the Property was vacant, EP argued that the Department should have granted EP a "660 hold."[2] EP further argued that it could not complete the requested repairs because the electric company had shut off electricity at the Property due to a wiring defect, and the electrical junction box was not located inside the Property or accessible from the Property. Rather, the junction box was located inside another unit not owned by EP, and EP was unsuccessful in its attempts to gain access to the box. Finally, EP asserted:

> Despite ongoing discussions between legal counsel for the . . . Department and legal counsel for [EP], and after the . . . Department was advised, both verbally and in writing on numerous occasions, that the former tenant and legal counsel for the former tenant stated several times in hearings and before a [j]udge that the former tenant no longer lived at the Property, the . . . Department improperly issued fines against [EP]. [EP] elects to appeal all fines imposed by the . . . Department on

---

[Article VI, §] 662: No owner, operator, tenant or occupant shall cause any service which is required under this Article to be removed, shut off or discontinued in any occupied dwelling except for such temporary interruption as may be necessary while actual repairs are in process or during temporary emergencies.

(Reproduced Record (R.R.) at 377a.)

[2] The term "660 hold" derives from Article VI, § 660(A) of the Department's Regulations, which provides: "Should a unit for which violations have been identified and orders issued become[] vacant prior to correction of these violations, the owner shall have the unit inspected and corrections verified by the Department prior to any reoccupancy." (R.R. at 380a.) The Hearing Officer explained:

> [The Department] will grant a 660[ ]hold when "a complainant moves out during the course of our investigation . . . . [The 660 hold] notifies the owner that they no longer have a timeframe to fix the violations, but the onus is on them to contact [the Department] prior to []reoccupancy for [the Department] to verify the violations have been corrected."

(*Id.* (some alterations added).)

3

the grounds that the 660 hold requested by [EP] . . . , which was still being discussed between respective legal counsel, and which factually applies, should have been granted.

(R.R. at 292a.)

On August 15, 2023, after an evidentiary hearing, the Hearing Officer dismissed EP's appeals. The Hearing Officer found that: (1) the Department "presented sufficient evidence to prove the existence of the conditions that gave rise to the imposition of the civil penalties";[3] (2) "the Property remained occupied by . . . Tenants throughout the relevant timeframe"; and (3) "[EP] had sufficient time to gain access to the junction box to restore electricity to the Property." (*Id.* at 381a-82a.)

Regarding occupancy, the Hearing Officer determined, "based on the preponderance of the evidence presented [at] the [h]earing, [that] the Property was occupied by . . . Tenants," finding that "Tenants' personal property remained at the Property from the initial inspection in August 2022 until the final inspection in February 2023." (*Id.* at 379a.) The Hearing Officer explained:

> While [EP] is probably correct that, due to the lack of heat at the Property beginning in October 2022, . . . Tenants were unlikely to have been able to reside there full[ ]time, Art[icle] VI does not require that a housing unit be occupied continuously for [the Department] to issue a fine under Art[icle] VI[,] §§ 629(A) and 662, and **the ongoing presence of . . . Tenants' items shows that they continued to occupy the Property in some capacity.**

(*Id.* (emphasis added).)

---

[3] EP does not challenge this finding by the Hearing Officer on appeal. (*See* R.R. at 378a (the Hearing Officer noted that EP "did not contest the existence of the violations," but it "challenged the imposition of the civil penalties on the bas[e]s that [] Tenants did not reside at the Property during the relevant timeframe and that [EP] was unable to restore electricity . . . due to a lack of access to the adjoining units").)

Next, the Hearing Officer rejected EP's claim that the Department should have granted a 660 hold because Tenants had allegedly vacated the Property. The Hearing Officer concluded:

> [Jeff O'Brien, an Environmental Health Supervisor for the Department,] clarified that [the Department] did not grant [EP] a 660[ ]hold because "it never look[ed] like . . . [T]enant[s] fully ever moved out of the [P]roperty. They may have temporarily moved out based on the conditions of the [P]roperty, but they did not fully abandon the [P]roperty and move out." . . . In this instance, [**the Department's**] **decision not to grant a 660**[ ]**hold to** [**EP**] **falls within the interpretable range of Art**[icle] **VI**[,] **§ 660(A)**. As nothing within that section of Art[icle] VI speaks to the need for [the Department] to grant the hold, [its] decision to only do so when it has determined that a tenant has fully vacated a property is **well within its discretion**.

(*Id.* at 380a-81a (emphasis and some alterations added).)

Finally, the Hearing Officer determined that EP had sufficient time to gain access to the adjoining units to restore electricity to the Property. The Hearing Officer concluded:

> While we do not doubt that there was initially some difficulty in gaining access to these adjoining units, we find that, **given the length of time between the initial inspection of the Property on August 12, 2022, and the issuance of the first** [penalty warning letter] **for failure to correct the electricity on November 25, 2022,** [EP] **should have been able to successfully abate the violation as directed by** [**the Department**]. The only efforts [EP] claimed to have made were emailing the city and calling the 311 line to gain access to the condemned unit and attempting to contact the landlord of the other unit.

(*Id.* at 381a (emphasis added).) The Hearing Officer also found "no legal reason why mere attempts to gain access to the junction box would excuse [EP] from the requirement to comply with Art[icle] VI[,] §§ 629(A), 630, 632(A) and 662" of the Department's Regulations, as "those sections set a standard of strict liability for

5

responsible parties and do not provide for any defense based on an inability to cure the violation." (*Id.*)

On August 31, 2023, EP appealed to the trial court, seeking to reverse the Hearing Officer's decision. Throughout the proceedings in the trial court, the parties engaged in ongoing settlement discussions and status conferences with the trial court.

On October 23, 2023, the trial court issued an order directing, in relevant part, that "[**EP**] **has thirty (30) days from the date of this Order to obtain any necessary affidavits. [EP] shall promptly submit the affidavits to the [Department] once they are received**, and the [Department] shall take those affidavits into consideration as an attempt to reach a settlement." (*Id.* at 306a (emphasis added).)

On June 7, 2024, the trial court issued the following Order:

> The parties are continuing to attempt to reach a settlement agreement. If the parties are unable to reach a settlement, both parties agreed to file, and submit to each other, Findings of Fact and Conclusions of Law, briefs regarding the fines, and any related reply briefs, if necessary. The parties shall submit their filings to my staff at least one (1) day prior to the scheduled argument.
>
> Importantly, the [Department] filed its record on September 19, 2023; however, **there has been no submission from [EP] as to whether it believes the record is full and complete or needs supplement[ation]. [EP] shall file any necessary supplementation to the record or expressly indicate that the record is full and complete, as soon as possible**.

(*Id.* at 308a (emphasis added).)

Thereafter, both parties filed Proposed Findings of Fact and Conclusions of Law with the trial court. Relevant to this appeal, EP appended to its Proposed Findings of Fact and Conclusions of Law, as "Exhibit A," an incomplete set of

6

discovery responses, dated November 28, 2023, and allegedly signed by one of the Tenants, from a separate eviction proceeding between EP and Tenants. "Exhibit A" contained statements indicating, among other things, that Tenants had ceased residing full time at the Property in June or July 2022. (*Id.* at 347a-52a.)[4]

The trial court heard argument on July 22, 2024, after which it entered the following order:

> The parties presented arguments today on their [Proposed] Findings of Fact and Conclusions of Law. **[EP] reports that it is attempting to provide a supplemental affidavit, [but] the [Department] objects to any supplementation of the record.**
>
> **[EP] shall file and submit to opposing counsel and my staff[] the supplemental affidavit, and any briefs related thereto, by end of business day on Friday, July 26, 2024.** The [Department] may file a reply brief within ten (10) days of receipt of [EP's] affidavit. **If there are no further filings, the parties otherwise agree that the record is full and complete.**

(*Id.* at 357a (emphasis added).)

---

[4] In its Proposed Findings of Fact and Conclusions of Law, EP stated, referencing "Exhibit A":

16. [B]riefs are being provided in lieu of additional testimony. Testimony would reflect new evidence subsequent to the April 25, 2023[] hearing of record. **The new evidence shows that no fine is appropriate and that all fines should be dismissed based upon the fact that Tenant[s] did not reside at the Property after July of 2022**, and based upon the fact that all violations were remedied as quickly as [EP] could do so.

. . . .

18. The finding of the Hearing Officer that [EP] could access the electrical junction box has been proven inaccurate by evidence confirmed after the April 25, 2023[] hearing date. As soon as [EP] could access the electrical junction box in a separate unit not owned by [EP], [EP] completed the repair.

(R.R. at 343a (emphasis added).)

7

EP did not file a supplemental affidavit by the July 26, 2024 deadline. Instead, on July 30, 2024, EP filed a supplemental brief with the trial court, in which it continued to assert that the Property had been unoccupied since July 15, 2022. The Department then filed a reply brief.

On August 5, 2024, the trial court issued an Order asking the parties to consider binding alternative dispute resolution (ADR). The Department, however, declined to participate in ADR.[5]

On August 22, 2024, the trial court issued an Order sustaining EP's appeal and vacating the Hearing Officer's findings of fact, concluding that they were unsupported by substantial evidence. The trial court stated:

> I am sustaining [EP's] appeal and vacating the findings of the Hearing Officer on August 15, 2023, as not supported by substantial evidence in concluding that "mere attempts" to access the other units is insufficient as a defense, irrelevant, and unsupported by the record. **Acknowledging and appreciating the comprehensive decision submitted by the Hearing Officer, I remain unpersuaded that "substantial" evidence exists to support the conclusion proffered.** Further, while I understand the argument that the [Department] correctly interprets its own regulations as requiring strict liability on the property owner, I would then have significant constitutional concerns regarding any regulation that does not afford a defense to a property owner.

(Trial Ct. Order, 8/22/24, at 1 (emphasis added).)

On September 9, 2024, the Department filed a Motion for Clarification of the trial court's August 22, 2024 Order. On September 19, 2024, the trial court heard argument on the Motion for Clarification, during which the trial court purportedly

---

[5] In the spring of 2024, EP finally gained access to one of the adjacent units and repaired the electrical junction box. On June 13, 2024, the Department sent a letter notifying EP that, following the Department's reinspection of the Property on June 11, 2024, all violations had been remediated. (R.R. at 354a.)

stated that it would grant the Motion.[6]  On that same date, following the argument, the Department filed a Notice of Appeal from the August 22, 2024 Order.

On October 4, 2024, the trial court issued a six-page "Clarification Order," in which it offered additional reasons and made additional factual findings in support of its August 22, 2024 Order, as follows:

> b. . . . [T]here are limits to the police power set out in *Ladd v. Real Est[ate] Comm[ission*, 230 A.3d 1096 (Pa. 2020),] and the strict liability interpretation applied by the Hearing Officer, along with his conclusion that [EP] made "mere attempts" to correct the violations, was not supported by substantial evidence.
>
> c. . . . [T]he substantial evidence indicated that no heat was provided to the Property since July 2022.  Ms. Nicole Robinson, a property manager for [EP], testified . . . before the Hearing Officer that there had been no electricity at the Property since 07/15/2022[,] and [the Department] agreed with this as well.  Ms. Robinson also testified that the Tenants . . . had moved most of their belongings out, leaving behind only non-essential items such as children's toys and non-perishable food.  Despite this testimony, [the Department] maintained that the Tenants retained control of the Property, but Ms. Robinson's testimony undoubtedly supported the conclusion that they had vacated the premises long before the citations and were no longer residing there as of 07/15/2022.
>
> d. . . . [B]ased on the evidence, I find that [the Department] improperly imposed fines totaling $20,618.98 on [EP].  There was no landlord-tenant relationship between [EP] and Tenant[s] . . . at the time the fines were issued, as they had vacated the premises months earlier and there was a judgment for possession against the Tenants. . . .  I further find that [the Department] could have more thoroughly investigated whether the Tenants were still living at the Property.
>
> e. . . . I find that [EP] made reasonable efforts to remedy the violations, despite the inability to access the electrical junction box located in a separate unit.  [Ms.] Robinson testified that [EP] had contacted various authorities, including the city's 311 line, attempted to reach the landlord of the other units, and maintained communication with [the

---

[6] The record does not contain a transcript from the September 19, 2024 argument.

9

Department] regarding their efforts to gain access to the junction box. These efforts were not "mere attempts" as the Hearing Officer described them, but substantial and diligent attempts to resolve the issue. [EP] could not fix what [it] could not access[;] however, once access was finally obtained, the necessary repairs were promptly made, and [the Department] acknowledged in writing on 06/13/2024 that all violations had been resolved.

f. Further, I find that [the Department] failed to grant a . . . 660 hold . . . , which would have been appropriate under the circumstances. Given that the Property was vacant and not occupied by the Tenant[s] when the violations occurred, the imposition of fines was not justified. . . . . Despite the testimony regarding the Tenants vacating the Property prior to the fines being imposed, the Department maintained that Tenants had some form of control over the Property due to the presence of leftover non-essential items[] . . . . However, I do not find that such items, particularly when coupled with the lack of electricity and heat, which the [Hearing] Officer acknowledged, are sufficient to establish occupancy.

g. The fines imposed by [the Department] are not reasonably proportional to the violations, as the Tenants did not reside at the Property, and all violations were remedied in a timely manner once [EP] obtained access. . . .

h. In my 07/22/2024 order, I directed [EP] to file a "supplemental affidavit and any briefs related thereto[.]" **While [EP] did not file a formal affidavit, [it] attached "Exhibit A" to [its] Proposed Findings of Fact, and Conclusions of Law,** which was filed prior on 07/20/2024. "Exhibit A" consists of . . . Tenant[s'] Answers to Interrogatories in a pending [e]jectment matter . . . , verified and signed by [one of the] Tenant[s]. **This exhibit, although not formally an affidavit, is legally sufficient and confirms that both Tenant[s] . . . ceased residing in the Property in June or July of 2022**. This further supports Ms. Robinson's testimony that Tenants had vacated the Property long before the fines were imposed and not based upon conditions existing when the Tenants were in residency.

i. **While I recognize that the Hearing Officer did not have the benefit of this evidence at the time of his decision, the verified answers in "Exhibit A" now weigh significantly in my conclusions of law. Given that the Tenants confirmed that they ceased residing at the Property in mid-2022, this contradicts the Hearing Officer's**

10

**conclusion that the Property was occupied during the time in question.** Therefore, I find that remanding the case for further evidentiary review would be unnecessary and inconsistent with final disposition for all parties.

(Trial Ct. Order, 10/4/24, at 1-5 (footnotes omitted) (emphasis added).) The trial court ultimately concluded that the Hearing Officer erred in finding "that the Property was 'occupied' within the meaning of Article [VI], that the . . . 660 hold was at [the Department's] sound discretion, and that [EP] could have accessed the junction box sooner." (*Id.* at 4.) The Department did not file an additional appeal from the Clarification Order.

On November 14, 2024, the trial court issued a brief Pa.R.A.P. 1925(a) Opinion (1925(a) Opinion), in which it questioned the validity of the Department's appeal from the August 22, 2024 Order. The trial court explained:

> **At the outset of the oral argument on 9/19/24, I had indicated to the parties that I had generally agreed with [the Department] that my 8/22/24 Order should be more clear and that I was granting [its] Motion for Clarification. I also told the parties during this argument that I would follow up with a written Clarification Order with the specifics to be determined after I had considered their respective arguments.** After hearing both parties' arguments[,] however, [the Department] apparently immediately left the courtroom and filed a Notice of Appeal, despite my granting of [its] Motion for Clarification before [it] had received, or for that matter, before I had any opportunity to draft[,] my Clarification Order. **By [its] actions, [the Department] effectively took a "snap" appeal and actually foreclosed the clarification that [it] had originally requested. Consequently, it is my opinion that [the Department's] Notice of Appeal [from the August 22, 2024 Order] should be stricken.**

(Trial Ct. 1925(a) Op., 11/14/24, at 2 (unpaginated) (emphasis added).)

The trial court thus opined that the Department's "Notice of Appeal should be stricken given [the trial court's] prior grant of [the Department's] Motion for Clarification" and that its Clarification Order "serves as the operative Order,

11

rendering the [a]ppeal from the original 8/22/24 Order inoperative." (*Id.* at 3.) However, the trial court also stated that if this Court determines that its "original 8/22/24 Order is the correct appealable Order, [**the trial court's**] **reasons for th**[**at**] **Order are found in** [**its**] **9/19/24 Clarification Order**,"[7] in which it "determin[ed] that the Hearing Officer had made errors of law by concluding that the [P]roperty was 'occupied' within the meaning of Article VI, that the . . . 660 hold was at [the Department's] sound discretion, and that [EP] could have accessed the junction box sooner." (*Id.* (emphasis added).)

## II. ANALYSIS

### A. Validity of Department's Appeal

Preliminarily, we must address whether the Department properly filed its appeal from the trial court's August 22, 2024 Order in light of the subsequently entered Clarification Order, as that question implicates this Court's jurisdiction to consider the appeal.

On September 9, 2024, the Department filed a Motion for Clarification of the trial court's August 22, 2024 Order. According to the trial court's subsequent 1925(a) Opinion, the trial court stated it would grant that motion during oral argument on September 19, 2024. Immediately following the argument, **before** the trial court issued its Clarification Order, the Department filed its Notice of Appeal from the August 22, 2024 Order. In its 1925(a) Opinion, the trial court posits that the Department's appeal from the August 22, 2024 Order should be stricken as premature. We disagree.

---

[7] Although the trial court wrote the date as the "19th day of September 2024" in the text of the Clarification Order, (Trial Ct. Order, 10/4/24, at 1), that was the date of the oral argument on the Motion for Clarification; the Clarification Order was not entered on the docket until **October 4, 2024**. (*See* Original Record at 2.)

Even though the trial court apparently indicated that it would grant the Motion for Clarification during the September 19, 2024 argument, the trial court took no formal action that could have extended the time to appeal from its August 22, 2024 Order, which remained in effect.[8]  The Department acted reasonably in filing its appeal on September 19, 2024, in order to preserve its appellate rights before the expiration of the 30-day appeal period.

Once the Department filed its appeal, the trial court was technically divested of jurisdiction to enter any subsequent orders.  *See* Pa.R.A.P. 1701(a) ("Except as otherwise prescribed by these rules, after an appeal is taken . . . , the trial court . . . may no longer proceed further in the matter."); *see also* Section 5505 of the Judicial Code, 42 Pa.C.S. § 5505 ("[A] court upon notice to the parties may modify or rescind any order within 30 days after its entry[] . . . if no appeal from such order has been taken or allowed.").  While a trial court may "correct" an order after the filing of an appeal, *see* Pa.R.A.P. 1701(b)(1), the power to correct does not extend to substantive modifications.  *See Pa. Indus. Energy Coal. v. Pa. Pub. Util. Comm'n*, 653 A.2d 1336, 1344-45 (Pa. Cmwlth. 1995) (recognizing that a trial court may correct or clarify an order that has been appealed under Pa.R.A.P. 1701(b)(1)), *aff'd*, 670 A.2d 1152 (Pa. 1996); Note to Pa.R.A.P. 1701(b)(1).  Examples of permissible corrections are "non-substantial technical amendments to an order, changes in the form of a decree, and modification of a verdict to add prejudgment interest."  *Pa. Indus.*

---

[8] Given the trial court's purported statement at oral argument on September 19, 2024, that it intended to grant the Motion for Clarification, the trial court could have (at the conclusion of the hearing, before the Department filed its appeal) vacated or rescinded its August 22, 2024 Order so it could issue a new order from which an appeal could have been taken.

*Energy*, 653 A.2d at 1344. "Such actions have no effect on the appeal or petition for review and cannot prompt a new appealable issue." *Id.* at 1345.[9]

Here, however, the trial court entered its Clarification Order on October 4, 2024, **after** the Department filed its appeal. In its 1925(a) Opinion, the trial court stated that if this Court determines that its "original 8/22/24 Order is the correct appealable Order, [**the trial court's**] **reasons for th**[at] **Order are found in** [**its**] . . . **Clarification Order**," which it attached and expressly incorporated therein. (Trial Ct. 1925(a) Op., 11/14/24, at 2 (emphasis added); *see* Pa.R.A.P. 1925(a)(1) (providing that if the trial court's reasons for an order do not already appear of record, the trial court "shall . . . file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of[]").) The Clarification Order provided a detailed explanation of the trial court's reasoning for its prior order and was attached to, and referenced in, its 1925(a) Opinion. Under these circumstances, we may treat the Clarification Order as part of the trial court's 1925(a) Opinion.

We conclude that the trial court's August 22, 2024 Order was the operative order for purposes of appeal, and, therefore, the Department properly and timely appealed from that Order.

### B. Trial Court's Standard of Review

Turning to the merits of the appeal, the Department first argues that the trial court misapplied Section 754 of the Local Agency Law, 2 Pa.C.S. § 754,[10] in

---

[9] The trial court's Clarification Order was also entered more than 30 days after the August 22, 2024 Order, so it cannot be considered an order granting a motion for reconsideration under Pa.R.A.P. 1701(b)(3).

[10] Section 754 of the Local Agency Law provides:

**(Footnote continued on next page…)**

14

reviewing the Hearing Officer's decision. According to the Department, the record was deemed full and complete by operation of EP's failure to submit an affidavit of non-occupancy in compliance with the trial court's orders and consistent with Pennsylvania precedent regarding full and complete agency records. Specifically, the Department contends that the trial court: (1) applied the incorrect standard of review under Section 754 of the Local Agency Law by reviewing the matter *de novo*, instead of applying the more deferential substantial evidence standard for a complete agency record; (2) improperly reweighed the evidence, made its own credibility determinations, and relied on additional evidence outside of the agency record; and (3) failed to notify the parties that the record was not full and complete or that it was relying on evidence outside of the agency record until it issued its Clarification Order. We agree with the Department.

Recently, our Court outlined the key legal principles governing the standard of review to be applied by a trial court in reviewing local agency decisions, as follows:

> (a) **Incomplete record.--**In the event a full and complete record of the proceedings before the local agency was not made, the court may hear the appeal *de novo*, or may remand the proceedings to the agency for the purpose of making a full and complete record or for further disposition in accordance with the order of the court.
>
> (b) **Complete record.--**In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. . . .

2 Pa.C.S. § 754.

A trial court's standard of review in deciding appeals from local agency decisions depends on the state of the record created before the agency:

> **In the event the proceedings before the local agency fail to establish a full and complete record**, the court of common pleas may hear the appeal *de novo*, or may remand the proceedings to the agency for the purpose of making a full and complete record or for further disposition in accordance with the order of the court. Section 754(a) of the Local Agency Law, 2 Pa.C.S. § 754(a).

> **Where a full and complete record is made before the local agency**, however, a reviewing court shall hear the appeal on the record supplied, and shall affirm the local agency's adjudication unless it violates constitutional rights, the local agency committed an error of law, the decision violates the provisions of the [Local Agency] Law, or necessary findings of fact are not supported by substantial evidence. Section 754(b) of the [Local Agency] Law, 2 Pa.C.S. § 754(b).

*In re Nevling*, 907 A.2d 672, 674 (Pa. 2006) (some internal citations omitted). *See also In re Thompson*, 896 A.2d 659 (Pa. Cmwlth. 200[6]). "A 'full and complete' record is defined as **a complete and accurate record of the testimony taken so that the appellant is given a [basis] upon which he may appeal and, also, that the appellate court is given a sufficient record upon which to rule on the questions presented**." *In re Thompson*, 896 A.2d at 668 (citation and some internal quotations omitted). Further,

> [s]ituations in which a record has been deemed incomplete include such instances where the record fails to contain a transcript of the proceedings before the local agency, or where a party refuses to provide relevant and necessary documentation to the local agency[.] . . . However, the record before the local agency is not considered incomplete based solely on a party's failure to present evidence available at the hearing. . . . Indeed, in [*Retirement Board of Allegheny County v. Colville*, 852 A.2d 445, 451 (Pa. Cmwlth. 2004)], we stated that "[t]he trial court has **no authority** under [S]ection 754(b) of the Local Agency Law to remand a matter to the local agency

16

> to give the appellant another opportunity to prove what he or she should have proved in the first place."

> *Kuziak v. Borough of Danville*, 125 A.3d 470, 475-76 (Pa. Cmwlth. 2015) (most internal citations and quotations omitted). The adequacy of a local agency's record is a matter typically committed to the discretion of the trial court. *Id.* at 475 n.3.

*Froetschel v. City of Pittsburgh Hist. Rev. Comm'n* (Pa. Cmwlth., No. 66 C.D. 2022, filed Apr. 14, 2023), slip op. at 7-9 (footnotes omitted) (emphasis and some alterations added).[11]

Throughout the trial court proceedings and in settlement discussions with the Department, EP had referenced an affidavit that it sought to procure from Tenants indicating that they no longer resided at the Property. As a result, the trial court issued an order on October 23, 2023, granting EP 30 days to obtain an affidavit. However, EP did **not** obtain an affidavit within that timeframe. Then, on July 22, 2024, the trial court again ordered EP to file a supplemental affidavit no later than July 26, 2024, clearly stating: "If there are no further filings, **the parties otherwise agree that the record is full and complete**." (R.R. at 357a (emphasis added).) Again, EP did **not** file an affidavit by that date. Although EP subsequently submitted a supplemental brief with the trial court, EP did **not** include an affidavit or otherwise request supplementation of the record in that brief.

The Department contends that the agency record **was** full and complete because it contained an accurate transcript of the hearing, all evidence presented at the hearing, all post-hearing briefing by the parties, and the Hearing Officer's Memorandum Opinion explaining the reasons for his decision. EP also did not dispute the accuracy of the transcript or evidence from the agency hearing. *See*

---

[11] Under Section 414(a) of this Court's Internal Operating Procedures, we may cite an unreported memorandum decision of this Court, issued after January 15, 2008, for its persuasive value. 210 Pa. Code § 69.414(a).

*Froetschel*, slip op. at 8; *G.W. v. Avonworth Sch. Dist.*, 297 A.3d 28, 41 (Pa. Cmwlth. 2023), *appeal denied*, 312 A.3d 317 (Pa. 2024); *see also SSEN, Inc. v. Borough Council of Borough of Eddystone*, 810 A.2d 200, 206-07 (Pa. Cmwlth. 2002) (concluding that an agency record containing an accurate transcript and hearing exhibits was full and complete under Section 754(b) of the Local Agency Law); *City of Philadelphia v. Bd. of License & Inspection Rev.*, 590 A.2d 79, 86 (Pa. Cmwlth. 1991) (defining a "full and complete record" as "'a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal[] and . . . the appellate court is given a sufficient record upon which to rule on the questions presented'") (citation omitted). The Department is correct that, as defined by our case law, the agency record in this case was full and complete.

Although the trial court stated in its August 22, 2024 Order that it was applying a "substantial evidence" standard, it is evident from the Clarification Order that it actually applied a *de novo* standard based on an incomplete agency record. It was in the Clarification Order that the trial court first stated that it relied "**significantly**" on the **additional evidence** EP submitted with its Proposed Findings of Fact and Conclusions of Law, (Trial Ct. Order, 10/4/24, at 5 (emphasis added)), which was **not** part of the agency record.

Notably, at the outset of the proceedings, the trial court issued an order specifically advising the parties as follows:

> **If I find the record is incomplete**:  a.) I may remand for further proceedings in order to make a more complete record **or** b.) order the supplementation of the record with existing documents that were used in the prior proceeding but was not included in the record submitted to me, **or** c.) hold a *de novo* evidentiary hearing if I find that a record was not made fully by the agency hearing officer below.

(Trial Ct. Order, 9/19/23, at 1 (emphasis added).)  This is consistent with Section 754(a) of the Local Agency Law, which provides that, **if the record is incomplete**, the trial court may **either** "hear the appeal de novo[] **or** . . . remand the proceedings to the agency for the purpose of making a full and complete record or for further disposition."  2 Pa.C.S. § 754(a) (emphasis added).

However, contrary to its September 19, 2023 Order, the trial court did **not** remand for further proceedings to make a complete record; did **not** order supplementation of the record before it with existing documents used in the prior proceeding, and did **not** conduct a *de novo* hearing due to the incompleteness of the agency record.  Rather, the trial court issued multiple orders permitting the parties to supplement the record by specific deadlines, if they believed the agency record was incomplete, and specifically gave EP multiple opportunities to file an affidavit of non-occupancy.  The trial court also informed the parties that if they did not comply, the trial court would consider the agency record full and complete.  EP **did not comply** with any of those directives.  Instead, EP appended an incomplete discovery document from a separate legal proceeding, to which the Department was **not** a party, to its Proposed Findings of Fact and Conclusions of Law.

Critically, the trial court never made a determination that the record was incomplete, and there is no argument on appeal that the record was **not** full and complete.[12]  Therefore, the trial court had no authority to allow supplementation of

---

[12] In its appellate brief, EP asserts:

> The [trial] court committed no error as it did not review the issues on appeal *de novo*.  The [trial] court employed the proper standard of review.  **Although the record was full and complete**, the [trial] court applied the proper standard of review as the findings of the Hearing Officer were unsupported by substantial evidence.

**(Footnote continued on next page…)**

19

the record or engage in any factfinding, and its order directing the parties to submit proposed findings of fact and conclusions of law was issued in error. *See Caputo v. Allegheny Cnty. Health Dep't* (Pa. Cmwlth., No. 207 C.D. 2019, filed Oct. 25, 2019), slip op. at 10 ("[T]he trial court did not conduct a hearing to take additional evidence. Instead, the trial court, relying upon the full and complete record created by the [h]earing [o]fficer, **drew its own findings of fact. In so doing, the trial court erred.**") (emphasis added). It was also error for the trial court to rely on EP's Proposed Findings of Fact, which were contrary to the Hearing Officer's findings, and to allow EP to submit an incomplete discovery document from a separate legal proceeding as support for those findings. The correct standard was for the trial court to examine whether there was substantial evidence to support the Hearing Officer's findings or whether the Hearing Officer committed an error of law. *See* 2 Pa.C.S. § 754(b).

It is well settled that "[i]n determining whether substantial evidence supports an agency's findings, a trial court may look **only** to the evidence relied upon by the fact[]finder, in this case the Hearing Officer." *Caputo*, slip op. at 9 (citing *Soc'y Created to Reduce Urban Blight v. Zoning Bd. of Adjustment*, 804 A.2d 147, 150 (Pa. Cmwlth. 2002)) (emphasis added). "**Nowhere** in Section 754 [of the Local Agency Law] is the reviewing court given **general authority to make its own findings of fact and conclusions of law when the local agency has developed a full and complete record** . . . ." *Soc'y Created to Reduce Urban Blight*, 804 A.2d at 150 (emphasis added); *see G.W.*, 297 A.3d at 41. Moreover, the trial court must accept the credibility determinations made by the agency that heard the testimony,

---

(EP's Br. at 15 (emphasis added).)

evaluated the witnesses' credibility, and served as factfinder and may not substitute its judgment on the merits for that of the agency. *Thompson*, 896 A.2d at 668.

Despite the fact that the trial court never found that the agency record was incomplete, it expressly acknowledged that EP's **extra-record evidence** "weigh[ed] significantly" in its decision to vacate the Hearing Officer's decision, (Trial Ct. Order, 10/4/24, at 5), which raises due process concerns.[13] The trial court also made its own factual findings and credibility determinations, which differed from the Hearing Officer's, based on its review of the agency hearing transcript, (*see id.* at 1-5), further indicating that, although it stated its analysis was a "substantial evidence" review, it did **not** actually apply a substantial evidence standard of review.

Based on the directives in the trial court's own orders, the record was deemed full and complete when EP failed to supplement the record within the trial court's multiple court-ordered deadlines. Furthermore, the trial court did not, in any of its orders, explicitly determine that the agency record was incomplete such that *de novo* review was warranted. Therefore, we conclude that the trial court erred in reviewing the matter *de novo* and in making its own factual findings and credibility

---

[13] In its appellate brief, the Department asserts that the trial court's reliance on this extra-record evidence prejudiced the Department, as follows:

> [T]he Department received no notice that the [trial c]ourt was considering these discovery responses [from the separate eviction proceeding]. Also, although the Department objected to the supplemental affidavit on procedural grounds, it did not have any opportunity to respond to the discovery responses, either on a procedural or substantive basis, because it never had any indication that the [trial c]ourt would consider them. **Being that [the Department] was never a party to the action from which the [d]iscovery [r]esponses originated, the Department was never permitted to test the veracity or authenticity of its contents, and the Hearing Officer, as fact[]finder, never heard the substance of those response[s] or took testimony on anything raised in those responses.**

(Dep't's Br. at 25 (internal citation omitted) (emphasis added).)

determinations based on evidence outside of the agency record. Because the agency record was full and complete, the trial court was required to limit its review to the record before the Hearing Officer and apply the appropriate deferential standard of review under Section 754(b) of the Local Agency Law.

### C. Review of Hearing Officer's Decision

Having concluded that the trial court applied the incorrect standard of review, we now determine whether the trial court erred in vacating the Hearing Officer's decision on the merits. The issues before this Court, "as they should have been before the trial court," are whether the Hearing Officer's findings of fact are supported by substantial evidence or whether the Hearing Officer committed an error of law. *Caputo*, slip op. at 10; 2 Pa.C.S. § 754(b).

First, the Department contends that the record contains substantial evidence to support the Hearing Officer's finding that the Property was occupied at the time the penalties were imposed. We agree.

Article VI, §§ 629(A) and 662 require that a dwelling unit be "occupied" in order for the Department to impose civil penalties for violations thereof. Article VI broadly defines "occupant" as a person who "lives, sleeps, cooks in a dwelling unit or who lives or sleeps in a rooming unit." (R.R. at 377a-78a (citing Art. VI, § 604).)[14]

Following the date that EP claims that Tenants vacated the Property – July 15, 2022 – the Department's inspector, Ms. Wilson, conducted seven separate inspections of the Property and observed indicia of occupancy during each visit. Ms. Wilson testified that during her first inspection in August 2022,

---

[14] The Hearing Officer noted that under Article XI of the Department's Regulations, titled "Hearings and Appeals," it is "the burden of the party asserting the affirmative of the issue to establish it by a preponderance of the evidence." (R.R. at 378a.)

[T]enant provided the keys to get into the unit. So that indicates to me that she has access to the unit. Her furniture is there: her bed mattresses, her kids' mattresses, their toys. She had food there, a case of water, and that sort of stuff. Just everything that you would have in your apartment was there.

(R.R. at 24a.) Also during the first inspection, Ms. Wilson testified that the closets "were not empty," explaining that "[i]t was comparable to my closet at home, which I would say that's full." (*Id.* at 52a.) In October 2022, Ms. Wilson observed that "[a]ll of Tenants' possessions were still there," including clothes, children's toys, and furniture, and Tenants "were still receiving mail at th[e] unit." (*Id.* at 27a-28a.) In November 2022, Tenants still had keys to the Property, which they used to grant her access, and Ms. Wilson observed that "[a]ll of [Tenants'] possessions were there, furniture, food, mail." (*Id.* at 35a.) In December 2022, Tenants granted Ms. Wilson entry to the Property, and she observed that "all [of their] possessions, furniture, all that was still there." (*Id.* at 39a-40a.) In January 2023, Ms. Wilson inspected the Property twice, and on both occasions she found that "[f]urniture, food, children's toys, and [Tenants'] possessions were all still in the unit." (*Id.* at 43a, 47a.) During Ms. Wilson's final inspection of the Property in February 2023, Tenants "provided [Ms. Wilson] access with [their] set of keys. [They] still had all [their] possessions there, furniture, and mail." (*Id.* at 49a.)[15]

Furthermore, Mr. O'Brien explained that the Department "consider[s] a property vacant when somebody is completely moved out. If they've abandoned the property, if they've moved, if locks have been changed, [and] they no longer have access to the property." (*Id.* at 92a.) With regard to the Property at issue here, Mr.

---

[15] In light of the uncontroverted testimony that Tenants provided Ms. Wilson access to the Property using their own keys during each of her seven inspections, the trial court clearly erred in finding that "[t]here was **no landlord-tenant relationship** between [EP] and [Tenants] at the time the fines were issued." (Trial Ct. Order, 10/4/24, at 2 (emphasis added).)

O'Brien testified that "[i]t never look[ed] like [T]enant[s] fully ever moved out of the [P]roperty," specifically noting that "[t]he locks were never changed. They always had access. They still had belongings in the [P]roperty." (*Id.* at 71a; *see id.* at 54a (Ms. Wilson testified that between her inspections, "[s]hoes on the floor" had been moved, "bottles of water had moved," "[s]ome of the furniture itself had moved, toys had moved"); *id.* at 58a (Ms. Wilson testified that Tenants "never told [her that they] moved out of the property" during any of the inspections).)

Conversely, EP presented the testimony of Ms. Robinson, who testified that, as of the date of hearing, April 23, 2023, there remained only a few non-essential items inside the Property. She testified:

> There is not what was initially in there, but yes, there are some belongings, like toys, of course, clothes all over the beds. There's really no living room furniture or anything. Just water, you know, nonperishable foods that were, like, in the kitchen on the floor. . . . [W]ould I say I was living there? No.
>
> . . . .
>
> [I]t looked nothing like when all the furniture and everything was still there.

(*Id.* at 128a.)

The Hearing Officer weighed the conflicting testimony on this issue and ultimately credited the Department's witnesses, concluding:

> [**B**]**ased on the preponderance of the evidence presented during the** [**h**]**earing, the Property was occupied by** [] **Tenants.** [The Department] provided testimony from Mr. O'Brien and Ms. Wilson showing that [] Tenants' personal property remained at the Property from the initial inspection in August 2022 until the final inspection in February 2023. While [EP] provided limited testimony from Ms. Robinson, who claimed that much of [] Tenants' personal property – including the couch and other furniture – had been removed, we find that [**the Department**] **presented more substantial and credible**

24

**evidence that tended to show that the [P]roperty remained occupied as defined by Art[icle] VI throughout the course of the relevant timeframe**.

(*Id.* at 379a (emphasis added).)  Importantly, the Hearing Officer acknowledged that while Tenants may not have resided at the Property on a full-time basis, the Department's Regulations do not require full-time occupancy in order to impose sanctions on a property owner.  The Hearing Officer concluded:

> While [EP] is probably correct that, due to the lack of heat at the Property beginning in October 2022, [] Tenants were unlikely to have been able to reside there full[ ]time, **Art[icle] VI does not require that a housing unit be occupied continuously for [the Department] to issue a fine under Art[icle] VI[,] §§ 629(A) and 662, and the ongoing presence of [] Tenants' items shows that they continued to occupy the Property in some capacity**.  Further, [EP's] interpretation of Art[icle] VI—where a landlord can effectively constructively evict a tenant by making the conditions of a housing unit so uninhabitable that the tenant is forced to vacate and then allow the landlord to escape liability—would frustrate the legislative intent of the Allegheny County Council and Board of Health.

(*Id.* (emphasis added).)

The Hearing Officer, as factfinder, properly weighed the testimony, determined that the Department's evidence was more credible than EP's, and concluded that the credited evidence established that the Property was occupied at the time of EP's violations.[16]  Therefore, applying the correct standard of review, we

---

[16] In finding that the Property was unoccupied at the time of the violations, the trial court relied solely on Ms. Robinson's testimony and did not address the conflicting testimony presented by the Department's witnesses.  (*See* Trial Ct. Order, 10/4/24, at 2.)  This further demonstrates the trial court's erroneous application of the standard of review, because it is evident that the trial court reviewed the transcript of the agency hearing and made its **own** credibility determinations that were contrary to those of the Hearing Officer.  *Cf. Caputo*, slip op. at 10 (holding that the trial court erred when it "rel[ied] upon the full and complete record created by the [h]earing [o]fficer[] [and] drew its own findings of fact"); *G.W.*, 297 A.3d at 41 (stating that when there is a full and complete agency record, the reviewing court has no authority to make its own findings of fact and conclusions of law); *In re Nevling*, 907 A.2d 672, 674 (Pa. Cmwlth. 2006) (stating that the trial **(Footnote continued on next page…)**

25

conclude that the Hearing Officer's determination that the Property remained occupied through February 2023 is supported by substantial evidence of record.[17]

Next, the Department asserts that the record contains substantial evidence to support the Hearing Officer's conclusion that a 660 hold was not warranted in this case. We agree.

Article VI, § 660(A) provides, in relevant part: "Should a unit for which violations have been identified and orders issued become[] vacant prior to correction of these violations, the owner shall have the unit inspected and corrections verified by the Department prior to any reoccupancy." (R.R. at 380a.) The Department's witness, Mr. O'Brien, testified that he had experience enforcing the Department's Regulations and was particularly familiar with 660 holds. Mr. O'Brien explained:

court "must accept the credibility determinations made by the local agency which hears the testimony, evaluates the credibility of the witnesses and serves as fact[]finder" and may not "substitute its judgment for that of the local agency").

[17] In its appellate brief, the Department highlights an additional factual error in the trial court's Clarification Order, as follows:

> The [trial c]ourt states, as support for the conclusion that the unit was not occupied, that "there was a judgment for possession against [] Tenants." The [trial c]ourt cites to [the testimony of Ms. Robinson] to support this contention. [Ms. Robinson's] full statement about an order of possession is as follows: "I said after the magisterial district awarded us possession, [] [T]enants appealed. [Tenants] went to the Court of Common Pleas and appealed that decision." [(R.R. at 104a.)] Thus, the [trial court's] blanket statement that there was an order of possession omits that, by [EP's] own testimony, that [o]rder was appealed. Further, at the time of the agency adjudication, the most recent [o]rder in the eviction proceedings between [EP] and [] Tenant[s] was made part of the certified agency record – this order, which was entered on August 17, 2022 . . . , quashes [EP's] Writ for Possession and explicitly requires [EP] to restore utilities as soon as practicable. Not only was this order a matter of public record and part of the certified agency record, but it was also explicitly highlighted for the [trial c]ourt in the Department's [s]upplemental [b]rief.

(Dep't's Br. at 34 (internal citations omitted); *see* R.R. at 399a.)

26

Section 660 is used when we have complaint housing investigation going on, and that complainant moves out during the course of our investigation. We put what's called a 660 [hold] on it. It notifies the [property] owner[s] that they no longer have a time[]frame to fix the violations, but the onus is on them to contact us prior to reoccupancy for us to verify the violations have been corrected.

(*Id.* at 70a.) Mr. O'Brien testified that the Department typically verifies vacancy either by directly confirming with the tenants that they have moved out or by conducting a visual inspection of the unit:

Typically, if we go out, we get a complaint. We go out. We do an inspection. We send a Notice of Violation[] to the ownership, to the responsible party. Sometime between that due date and the tenant[s] or the [property] owner . . . will notify us saying that [the tenants have] moved out of the property. Or when we call to schedule the reinspection, the tenant[s] will say they moved out and they no longer have access to the property. We'll go by the property and will verify vacancy. We will look through windows to see if furniture was removed, personal belongings are removed. Then we would put [a] 660 on the inspection report.

(*Id.* at 70a-71a.) Mr. O'Brien clarified, however, that the Department would **not** grant a 660 hold if a unit is unoccupied only temporarily. (*Id.* at 71a.) He then testified that the Department did not apply a 660 hold in this case because

it never look[ed] like [T]enant[s] fully ever moved out of the [P]roperty. **They may have temporarily moved out based on the conditions of the [P]roperty, but they did not fully abandon the [P]roperty and move out. The locks were never changed. They always had access. They still had belongings in the [P]roperty.**

(*Id.* (emphasis added).)

The Hearing Officer credited and expressly relied on Mr. O'Brien's testimony. (*See id.* at 380a.)[18] Based on that testimony and the language of Article VI, the

---

[18] EP does not specifically challenge Mr. O'Brien's testimony regarding the 600 hold. In fact, the entirety of EP's argument on this issue is that "[t]he [trial c]ourt . . . properly and **(Footnote continued on next page…)**

27

Hearing Officer found that the Department's decision to not grant a 660 hold under the circumstances was proper, as "nothing within [S]ection [660(A)] of Art[icle] VI speaks to the need for [the Department] to grant the [660] hold" and the Department's "decision to only do so when it has determined that a tenant has fully vacated a property is well within its discretion." (*Id.* at 380a-81a.) As discussed above, the Hearing Officer found that the Property was still occupied by Tenants through February 2023. (*Id.* at 379a (stating that the evidence at the hearing established "that [] Tenants' personal property remained at the Property from the initial inspection in August 2022 until the final inspection in February 2023").) Therefore, the Hearing Officer correctly determined, based on the credited evidence of record, that the Department was not required to grant a 660 hold in this case.

Finally, the Department asserts that the record contains substantial evidence to support the Hearing Officer's finding that EP's attempts to restore electricity to the Property were insufficient to abate its violation of Article VI, § 662. (*See* R.R. at 377a (Article VI, § 662 prohibits a property owner from "caus[ing] any service which is required . . . to be removed, shut off or discontinued in any occupied dwelling").) In response, EP maintains that it "should not be strictly responsible for a repair that it could not make" and that "[Ms.] Wilson and the . . . Department failed to act in good faith and to conduct sufficient du[]e diligence regarding whether Tenants occupied [the Property]." (EP's Br. at 17.) The record belies this claim.

As explained above, the Department's inspector conducted seven separate inspections of the Property between August 2022 and February 2023, each time gaining entry into the unit via Tenants' keys, with their permission, and personally

---

reasonably found that [the Property] was not occupied and that [the Department] should have granted [EP] a 660[ ]hold. The related rulings of the Hearing Officer were unsupported by substantial evidence." (EP's Br. at 17.)

28

observing the condition of the unit and the ongoing violations. We cannot conclude, based on the evidence of record, that the Department failed to act in good faith or with due diligence in determining that the Property remained occupied during the relevant period. Notably, EP does not suggest what more the Department could have done before making that determination.

With regard to the lack of electricity at the Property, the Hearing Officer determined:

> During her testimony, Ms. Robinson stated that [EP] was unable to access one of the units because it was condemned and another because the occupant would not allow it access. While we do not doubt that there was initially some difficulty in gaining access to these adjoining units, **we find that, given the length of time between the initial inspection of the Property on August 12, 2022, and the issuance of the first [penalty assessment letter] for failure to correct the electricity on November 25, 2022, [EP] should have been able to successfully abate the violation as directed by [the Department]. The only efforts [EP] claimed to have made were emailing the [C]ity [of Pittsburgh] and calling the 311 line to gain access to the condemned unit and attempting to contact the landlord of the other unit.**

(R.R. at 381a (emphasis added).) Thus, the Hearing Officer considered the testimony by EP's witness and determined that, in the three months between the start of Department's enforcement efforts and the initial issuance of penalties, EP should have been able to make the required repair. EP does not contend that it made any other attempts to restore electricity to the Property aside from those identified above, nor does it challenge the Hearing Officer's findings on this issue as unsupported by substantial evidence. Therefore, we conclude that the record contains substantial

29

evidence to support the Hearing Officer's finding that EP's attempts to restore electricity to the Property were insufficient to abate the violation.[19]

### III. CONCLUSION

In sum, we conclude that the trial court erred when it made its own factual findings and credibility determinations and substituted its judgment for that of the Hearing Officer because the agency record was full and complete. The trial court also erred when it vacated the Hearing Officer's decision on the merits because the Hearing Officer's findings of fact are supported by substantial record evidence. Accordingly, we reverse the trial court's Order.

_____
RENÉE COHN JUBELIRER, President Judge

---

[19] In the alternative, the Hearing Officer noted that, even if EP had established sufficient attempts to abate the violation, Article VI "set[s] a standard of strict liability for responsible parties and do[es] not provide for any defense based on an inability to cure the violation." (R.R. at 381a.) However, given our conclusion that substantial evidence supports the Hearing Officer's finding that EP's attempts to access the electrical junction box were insufficient, we need not address this alterative basis for the Hearing Officer's ruling.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eminent Properties LLC        :
       :
       v.        :    No. 1255 C.D. 2024
       :
Allegheny County Health        :
Department,        :
       Appellant        :

# **O R D E R**

NOW, July 18, 2025, the August 22, 2024 Order of the Court of Common Pleas of Allegheny County is hereby **REVERSED**.

_____
RENÉE COHN JUBELIRER, President Judge